**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee,*

v.                                    No. 06-4216

GREGORY WAYNE BANKS,
         *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:04-cr-00578-JFM-2)

Argued: January 31, 2007

Decided: April 13, 2007

Before WILKINS, Chief Judge, and WILLIAMS and
DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in
which Chief Judge Wilkins and Judge Williams concurred.

## COUNSEL

**ARGUED:** Denise Charlotte Barrett, Assistant Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Bal-
timore, Maryland, for Appellant. Martin Joseph Clarke, Assistant
United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James
Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant.

Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

DUNCAN, Circuit Judge:

Gregory Wayne Banks ("Banks") appeals, on various grounds, his convictions for drug and conspiracy charges relating to a prescription-drug fraud scheme that spanned a period from 1999 to 2004. Specifically, Banks asserts that the trial court erred in denying his motion to suppress evidence obtained from an inventory search of two duffle bags brought to the police station during a 2000 arrest. Banks also seeks a new trial because the trial court admitted certain notations written on fingerprint cards by an evidence technician at the scene of a 2001 raid of one of the conspirators' sham medical clinics. Finally, Banks requests a remand to allow the trial court to conduct a retrospective evaluation of his competency to stand trial.

For the reasons discussed below, we affirm his convictions.

I.

Banks was one of several persons arrested in connection with a prescription-drug fraud scheme occurring in the Baltimore, Maryland area. The evidence at trial revealed a conspiracy in furtherance of which Banks and Oliver Hudson ("Hudson"), his half-brother and codefendant, coordinated the creation and "passing" of fraudulent prescriptions for oxycodone products. The conspirators wrote the prescriptions on prescription pads bearing the names and Drug Enforcement Administration ("DEA") registration numbers of seven legitimate area physicians. However, the pads falsely associated each physician with a sham medical clinic. The physicians had no knowledge of the appropriation of their names.

During the five-year conspiracy, Banks and Hudson created ten medical clinics to lend seeming authenticity to the prescriptions they wrote. Banks had primary responsibility for leasing office space for

each clinic and connecting the telephone lines, though the clinics did not actually serve any patients. Banks also ensured that the clinics were staffed during business hours, by himself, Hudson, or a person they hired.

Banks and Hudson hired runners to pass the prescriptions at area pharmacies. If a pharmacist became suspicious while filling the prescription and called the listed telephone number, the person staffing the clinic was available to verify its legitimacy. Overall, Banks coordinated the passing of prescriptions at seventeen different pharmacies.

Government witness Nadira Jenkins-El, a former runner for Banks and Hudson in 2000-2001, testified as to Banks's daily routine in furtherance of the conspiracy. Banks and Hudson would meet privately in the morning to discuss the agenda for the day. Banks would then drive Hudson, Jenkins-El, and another runner or two from pharmacy to pharmacy in Banks's van. Banks or Hudson would fill out the fake prescription en route. Upon arrival, Banks would drive around the pharmacy, looking for a parking space far from any security cameras. The runner would then attempt to fill the prescription. Only a small copay, or sometimes no copay, was required to procure the pills because the runner used one of several medical assistance cards (e.g., Medicaid cards) that Banks and Hudson "leased" from "other drug addicts off of the street." J.A. 553.

At the end of a typical day, Banks would drop the runners off at the Metro Therapy and Wellness Center (the "Metro Center"), the sham clinic supporting the conspiracy during Jenkins-El's tenure. Banks and Hudson would sell the day's cache of pills to a local drug dealer, and would then return to the Metro Center to pay the runners from the proceeds. Jenkins-El agreed that both Banks and Hudson were "calling the shots" from day-to-day. J.A. 560.

The conspiracy did not escape detection by law enforcement for long, however. In April 2000, a runner, Nicholas Eggleston, raised the suspicion of a pharmacist at a Target pharmacy. The pharmacist called Detective Scott Gunn of the Anne Arundel County Police Department (the "AACOPD") after Eggleston dropped off the forged prescription. When Eggleston returned the following day to pick up the filled prescription, the pharmacist again called Det. Gunn, who

asked the pharmacist to stall Eggleston until Det. Gunn could make his way to the Target. Det. Gunn then called the AACOPD station-house and requested that a uniformed officer respond to the Target.

Target security officers had earlier observed Eggleston exiting a black Lincoln Town Car[1] with Banks. While Eggleston was waiting for the prescription to be filled, Banks walked around the store. By the time Det. Gunn arrived, the requested uniformed officer had arrested both Eggleston and Banks, and was holding them in the Target security office. Det. Gunn recognized Banks's name because he had issued a warrant for Banks several months prior for passing a forged prescription. A routine check revealed four outstanding warrants for Banks's arrest. Eggleston was arrested for passing the forged prescription at Target, but Banks was arrested only in connection with the outstanding warrants.

Det. Gunn asked Banks if there was anything in the Lincoln that he wished to bring with him to the stationhouse. Banks requested two black bags located in the trunk of the Lincoln. Det. Gunn retrieved the keys from Banks, and then Banks was taken to the stationhouse by the arresting officer. Eggleston remained with Det. Gunn.

Det. Gunn found Hudson and Cathy Jones, a runner, asleep in the back seat of the Lincoln. Det. Gunn woke them and, when a query failed to reveal any outstanding warrants for either, released them. Det. Gunn then retrieved the two bags that Banks had requested. These bags were the trunk's only contents. After securing the Lincoln, Det. Gunn drove Eggleston to the stationhouse.

As booking personnel conducted intake procedures of Banks and Eggleston, Det. Gunn opened the two bags for the first time. He immediately noticed contraband in the form of medical assistance cards and prescriptions and informed Banks that the contents of the bags would not be returned to him upon his release from detention.[2]

---

[1]Testimony at trial revealed that Banks and Hudson sometimes used rental cars instead of Banks's van to coordinate a day's activities.

[2]The record does not reveal for how long Banks was detained, or under what conditions he was released.

Over the next few days, Det. Gunn inventoried the contents of the bags in his office, itemizing the contraband on an investigative report. The inventory revealed numerous prescriptions, dozens of prescription labels, and a blank prescription pad. Det. Gunn contacted the DEA, requesting that the items be collected. After being stored for "a long time" under Det. Gunn's desk, J.A. 212, the bags were finally transferred to the DEA.

In 2001, a search warrant was executed at the Metro Center. AACOPD Det. Leslie Stickles led the raiding team, while evidence technician Lorraine Stieff ("Stieff") dusted and collected latent fingerprints from inside the Metro Center. According to later testimony by the fingerprint examiner, Ernest Lowman ("Lowman"), Stieff handwrote notations on two fingerprint cards indicating that the prints had been lifted from inside the Metro Center and then placed those fingerprint cards in Lowman's lockbox for analysis. These actions complied with AACOPD procedures. Lowman identified Banks's fingerprints on the two fingerprint cards.

Eventually, the Federal Bureau of Investigation (the "FBI") began investigating Banks's and Hudson's operations, and subjected them to wiretaps and surveillance. A survey of area pharmacies yielded two fraudulent passed prescriptions with Banks's fingerprints on them. In December 2004, Banks was indicted on numerous drug charges, including one count of conspiracy to distribute a controlled substance, 21 U.S.C. § 846.[3]

Banks was initially represented by Frank Draper ("Draper" or "Counsel"), of the federal public defender's office. In August 2005, however, Banks and Hudson each filed a series of spurious pro se motions arguing that the court had no subject matter jurisdiction because each was a "real, live flesh and blood Man." J.A. 119-20. At

---

[3]The other counts against Banks included six counts of possession of a controlled substance with intent to distribute, 21 U.S.C. § 841(a)(1); five counts of health care fraud, 18 U.S.C. § 1347; five counts of obtaining a drug by fraud, 21 U.S.C. § 843(a)(3); five counts of misbranding drugs, 21 U.S.C. § 331(k); and one count of engaging in a continuing criminal enterprise, 21 U.S.C. § 848(a). Hudson was also charged in these and other counts.

his next appearance, Banks informed the magistrate judge for the first time that he did not understand the proceedings against him. He reiterated his jurisdictional argument, moved to fire his attorney, and was ultimately removed from the courtroom for being disruptive. Hudson had engaged in similar behavior earlier in the same hearing.

At a subsequent hearing before the district court to decide Banks's and Hudson's motions to terminate counsel, Banks insisted that Draper labored under a conflict of interest because he worked for the government. Draper reported that, despite Banks's initial cooperation, he now refused to meet with him or to open mail from him. Draper expressed surprise at Banks's sudden change in behavior, speculating that Hudson was directing Banks's actions. After the district court denied the motions, Banks and Hudson refused to participate further in their joint trial. They refused to attend subsequent proceedings, which nevertheless continued in their absence.

Prior to trial, Banks's counsel moved to suppress all evidence recovered as a result of Det. Gunn's search of Banks's two bags. The district court denied the motion, finding Det. Gunn's search to be an "inventory search" and thus allowable without a warrant.

During the trial testimony of Lowman, the fingerprint examiner, the government sought to introduce the two fingerprint cards completed by Stieff during the 2001 raid of the Metro Center. The government also asked Lowman to read Stieff's notations from the cards, identifying whence the fingerprints originated. Counsel objected to the admission of the cards and the reading of the notations on the basis that Stieff's absence from trial rendered the notations inadmissible hearsay. The district court overruled the objection and admitted the cards and the reading of the notations under the business records hearsay exception, Fed. R. Evid. 803(6). Lowman proceeded to testify that the fingerprint cards identified that both prints were lifted from inside the Metro Center, one "[f]rom a Burger King cup . . . in a closet," and the other "[f]rom a glass mug that was in the closet." J.A. 512.

The jury ultimately convicted Banks on all but one count. The district court sentenced Banks to sixteen years' confinement. Banks timely appealed, highlighting three purported errors in his trial, each

one of which, he argues, requires that he be granted a new trial. We discuss each contention in turn.

## II.

Banks argues first that the district court erred in denying his motion to suppress, on Fourth Amendment grounds, the evidence obtained from Det. Gunn's search of the two bags.[4] Banks contends that the search was illegal and that all evidence against him that was obtained subsequent to this search is thus "fruit of the poisonous tree . . . because it would not have come to light but for the illegal actions of the police," *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The government insists that the district court properly found that the search, though warrantless, is valid under the "inventory search" doctrine, *South Dakota v. Opperman*, 428 U.S. 364, 374-76 (1976).

In examining a district court's "ruling on a motion to suppress, we review conclusions of law de novo and underlying factual findings for clear error." *United States v. Buckner*, 473 F.3d 551, 553 (4th Cir. 2007) (emphasis omitted).

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *see also United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006). Any evidence obtained in violation of the Fourth Amendment may be suppressed under the exclusionary rule. *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004). A warrantless search is nevertheless valid, and the evidence obtained from the search admissible, if the search "'falls within one of the narrow and well-delineated exceptions' to the Fourth Amendment's warrant requirement." *Currence*, 446 F.3d at 556 (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999)). One such exception arises when the search is merely an "inventory search." *Opperman*, 428 U.S. at 374-76.

---

[4]Banks does not challenge on appeal the seizure of the two bags from the trunk of the Lincoln, but rather only the search thereof after they were properly within police custody.

A proper inventory search is merely "an incidental administrative step following arrest and preceding incarceration," *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983), conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing, *id.* at 646. Such inventory searches, however, must "be conducted according to standardized criteria." *Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987).

Such standardized criteria are often codified by a police department into a uniform inventory-search policy. For such a policy to be valid, it must curtail the discretion of the searching officer so as to prevent searches from becoming "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Otherwise, the policy might devolve into "'a purposeful and general means of discovering evidence of a crime.'" *Id.* (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)). Nevertheless, an inventory-search policy may leave the inspecting officer "sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.*

Standardized search procedures must be "administered in good faith" for their attendant searches to satisfy the Fourth Amendment. *Bertine*, 479 U.S. at 374. That is, an inventory search conducted pursuant to standardized procedures is valid "so long as the purpose of the inventory is . . . not to gather incriminating evidence against the owner." *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986).

At the time of Det. Gunn's search of the bags in the instant case, the AACOPD had in place a written inventory-search policy that specified with particularity the intake steps that should be followed by booking personnel in processing detainees.[5] Banks does *not* challenge

---

[5]The policy provides, in relevant part:

VII. DETAINEE PROCESSING

A. Weapon Search

Any officer who brings a prisoner to a holding facility will search the prisoner and remove and safeguard any weapons

the constitutional sufficiency of the inventory-search policy itself. Instead, he highlights six discrepancies between Det. Gunn's actions in searching the two bags and the procedures required by AACOPD policy: (1) the policy required the initial search of Banks to be conducted by "the officer in custody of" him, who was the arresting officer, not Det. Gunn, *see* J.A. 263; (2) booking personnel, not Det. Gunn, should have performed the inventory; (3) all items found in the

found on the prisoner before taking the prisoner into the booking area or placing him in a holding cell.

B. Inventory Search

Once inside the booking area or holding facility, the officer in custody of the prisoner will conduct an inventory search of the prisoner before the prisoner is booked or placed in a holding cell. The officer will seize and remove any weapons, contraband, evidence, and property that is not permitted to accompany the prisoner into the holding cell, prior to proceeding with booking or placing the prisoner in a holding cell. . . .

C. Itemized Inventory of Prisoner Property

Booking personnel will inventory and prepare an itemized list of all property taken from a prisoner, and all property (including paper currency) retained by the prisoner. The inventory will be documented on the "Holding Facility Intake" form (PD 2004). Booking personnel will sign and date the property inventory sheet.

The prisoner will be asked to sign the inventory form acknowledging the property that was taken. Prisoners with no property will sign an inventory form marked "No Property". If the prisoner refuses to sign, another employee will sign the form as a witness to its accuracy.

. . .

E. Secure Storage of Prisoner Property

Booking personnel are responsible for the secure storage of all property taken from a prisoner. Each prisoner's property will be segregated from all other property and locked in secured facilities until it is returned to the prisoner or placed in the property management system.

J.A. 263-64.

bag, not just the contraband, should have been inventoried; (4) the inventory should have been recorded on the proper inventory form, not on an investigative report; (5) booking personnel, not Det. Gunn, should have secured the property; and (6) the property should have been securely stored, not placed under Det. Gunn's desk.

Banks makes two arguments based on these six discrepancies. First, he contends that the discrepancies themselves amount to a constitutional violation, even if the search was conducted innocuously. Second, he argues that the discrepancies revealed that Det. Gunn's purpose in conducting the inventory was to gather incriminating evidence. The government insists that the discrepancies do not evince a pretextual motive for the search, but that instead Det. Gunn "fortuitous[ly] discover[ed the] evidence during a routine booking procedure." Appellee's Br. at 26.

We find Banks's focus on Det. Gunn's alleged lack of technical compliance with the *written* policy governing the intake of arrestees *by booking personnel* to misunderstand the requirement that inventory searches "be conducted according to standardized criteria," *Bertine*, 479 U.S. at 374 n.6. To be sure, the written policy of the AACOPD establishes certain standards for the processing of the typical arrestee and the inventory of the possessions he carries. The policy does not, however, specify the precise procedures to be followed in every circumstance. Indeed, the policy details only the search required of "[a]ny officer who brings a prisoner to a holding facility," guiding that officer to "conduct an inventory search of the prisoner before the prisoner is booked." J.A. 263. The policy is silent regarding the proper procedures to be followed in the unusual scenario here, in which the non-arresting officer is nevertheless in possession of certain of the arrestee's belongings that the arrestee himself requested be delivered to the stationhouse.

In *Lafayette*, the Supreme Court upheld a search of a shoulder bag carried into a stationhouse by an arrestee, not because of technical compliance with a written policy, but because it was "standard procedure to inventory 'everything' in the possession of an arrested person." 462 U.S. at 642. Similarly, the question before us is not whether Det. Gunn complied with all the written directives governing one particular application of the standardized procedures for inventory

searches at the AACOPD, but whether, in light of the unusual circumstances leading to Det. Gunn's possession of the two bags at the stationhouse, he acted in accordance with standard procedures more generally.

The written policy reveals that the end result of an inventory search in the typical arrest scenario is that the arrestee's person and possessions are searched, with paper currency returned immediately to the arrestee, other personal property stored until the arrestee's release, and contraband seized and secured. Det. Gunn's search of the bags mirrored this routine practice. Just as the bags would have been searched and their contents confiscated and secured by booking personnel in a typical arrestee processing, they were searched, confiscated and secured by Det. Gunn.

Banks may only succeed in challenging the search of the bags, then, by showing that Det. Gunn's search was motivated by "an investigatory police motive," *Opperman*, 428 U.S. at 376. *See id.*; *Brown*, 787 F.2d at 932 (allowing searches "so long as the purpose of the inventory is . . . not to gather incriminating evidence against the owner"). This second argument is fatally weakened, however, by the district court's finding that Det. Gunn's actions were "perfectly reasonable . . . under the circumstances and do[ ] not betoken bad faith on his part." J.A. 259. This factual finding must be upheld on appeal unless clearly erroneous. *Buckner*, 473 F.3d at 553.

Banks presented no evidence that Det. Gunn initiated the search of the bags or conducted the inventory search because he suspected that he would find incriminating evidence therein. To be sure, Det. Gunn's decision to perform the inventory himself in his office, instead of following the usual procedures, was irregular. The irregularity was due in part, however, to the unusual circumstances of the arrest. The arresting officer, though he responded first to the Target, was only involved because of Det. Gunn's distance from the pharmacy at the time Eggleston and Banks arrived at the store. Furthermore, the bags were not in Banks's physical possession because they were procured by Det. Gunn, *at Banks's specific request*, after his arrest.

The district court credited Det. Gunn's explanation that "[b]ased on the information that [he] found in the bags, [he] knew that this [case]

was beyond [him]," J.A. 213, and he thus proceeded to inventory the bags himself and to contact the DEA instead of leaving the bags full of facially incriminating evidence with the booking personnel to be inventoried and stored. The district court found that Det. Gunn's explanation in fact "add[ed] to his credibility." J.A. 258. The district court finally noted that once the bags were lawfully brought into the stationhouse with Banks, it was inevitable that some AACOPD employee would have "to look through it to see what's there." J.A. 259.

We hold that because Det. Gunn did replicate standard procedures in conducting the search of Banks's bags to the extent possible on these facts, and because the district court's finding that Det. Gunn acted in good faith was not clearly erroneous, Banks cannot show that the search of the bags was constitutionally improper.

### III.

Banks next argues that the notations of evidence technician Stieff on the fingerprint cards were erroneously admitted into evidence for two reasons: (1) the notations are inadmissible hearsay; and (2) their admission would violate the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004). We need not decide whether the district court erred, however, because we hold that any error would be harmless in light of the other evidence inculpating Banks.

Evidentiary rulings are "subject to harmless error review." *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997). Similarly, a Confrontation Clause violation may be found harmless on appeal. *United States v. Khan*, 461 F.3d 477, 496 (4th Cir. 2006); *Crawford*, 541 U.S. at 76 (Rehnquist, C.J., concurring in the judgment) (reading the majority opinion to "implicit[ly] recogni[ze]" that Confrontation Clause violations continue to be "subject to harmless-error analysis"). "[I]n order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Brooks*, 111 F.3d at 371 (alteration in original) (internal quotation omitted).

First, we note that the evidence technician's notations may not have been necessary to link the fingerprint cards to the situs of the

lifted prints. Det. Stickles, who supervised the raid at the Metro Center, testified at trial that Stieff collected, and later submitted impressions of, fingerprints found at the scene. Lowman, the fingerprint examiner, then testified that he had dispatched the evidence technician to the Metro Center with the raiding party and had later retrieved the fingerprint cards from his lockbox. Even without the admission of Stieff's notations, then, a reasonable jury might have inferred that the fingerprint cards contained fingerprints lifted from the Metro Center.

More significantly, the government presented a substantial amount of evidence tending to inculpate Banks. The uncontradicted testimony of Jenkins-El, for example, revealed firsthand knowledge of Banks's involvement in the conspiracy and in the other charged crimes. The contents of Banks's two bags, including a blank fraudulent prescription pad and medical assistance cards, provided strong corroborating evidence of his guilt. Finally, Banks's fingerprints were also found on two fraudulently passed prescriptions, one of which was issued by the Metro Center. Together with wiretap and surveillance recordings, this evidence was more than sufficient to support Banks's conviction. Therefore, even if the admission of the evidence technician's notations did constitute an evidentiary or constitutional error, Banks's substantial rights were not violated and any error would be harmless.

## IV.

Finally, Banks argues that the district court should have ordered sua sponte a competency hearing and requests that we remand for a new trial or retrospective competency evaluation. We hold that the district court did not abuse its discretion in failing to so order.

It would be a violation of due process to convict a defendant when he is legally incompetent. *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). "Congress has safeguarded this [due process] right by providing that trial courts conduct competency hearings" under specified circumstances. *Id.* (citing 18 U.S.C. § 4241(a)). Of relevance here, when neither party to a criminal trial moves for a competency hearing, the district court

> shall order such a hearing on its own motion[ ] if there is
> reasonable cause to believe that the defendant may presently

be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

§ 4241(a); *see also Mason*, 52 F.3d at 1289 (recognizing that the existence of reasonable cause requires the sua sponte ordering of a competency hearing). Whether such reasonable cause exists, however, is left to the discretion of the district court. *Mason*, 52 F.3d at 1289. Thus, the challenge here is a "procedural competency claim"; Banks need not demonstrate on appeal that he was in fact incompetent, but merely that the district court should have ordered a hearing to determine the ultimate fact of competency. *See United States v. General*, 278 F.3d 389, 396 (4th Cir. 2002). We review such a challenge for abuse of discretion, under which standard "this Court may not substitute its judgment for that of the district court; rather, we must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *Mason*, 52 F.3d at 1289. We defer so to the district court because it is in a superior position to adjudge the presence of indicia of incompetency constituting reasonable cause to initiate a hearing.

Banks argues that he exhibited a sudden change of behavior in the months before the trial began, metamorphosing from a cooperative client and defendant into an irrational and paranoid incompetent. Banks cites as predicates for reasonable cause his accusation at a pretrial hearing that his court-appointed counsel was sharing secrets with the government; his frivolous "real, live flesh and blood Man" motions, J.A. 119-20; his refusal to meet with counsel or participate in his trial; and his insistence throughout the hearings and trial that he did not understand the proceedings against him.

There was nothing before the district court to suggest that Banks's behavior reflected anything other than an ill-advised, self-defeating legal strategy. Indeed, both Banks and Hudson were initially cooperative with the court, then abruptly began pursuing the same strategy of refusing to recognize the subject matter jurisdiction of the court and refusing to participate in the proceedings. Far from suggesting that Banks was suffering from mental delusion, his parroting of Hudson's arguments intimated instead his trust in his brother's blueprint for

gaining a successful outcome. *See, e.g.*, J.A. 307-09 (recounting Hudson's detailed explication at trial of his subject-matter-jurisdiction argument, followed by Banks's rejoinder, "I state the same thing. . . . Same position. . . . Thank you"). Furthermore, Banks's attorney informed the district court that Banks's and Hudson's legal strategy is available for sale over the Internet and enjoys relative popularity within the prison population.

The district court viewed Banks's behavior as reflective of a strategy to provide the basis for success on appeal. Were we to adopt Banks's argument and remand for a competency hearing, we would validate Banks's trial strategy. The requirement of § 4241(a) that the district court grant a competency hearing when reasonable cause exists cannot be expanded to require such a hearing any time that a defendant engages in disruptive tactics or pursues a frivolous legal strategy. We therefore find that the district court did not abuse its discretion in failing to order sua sponte a hearing to determine Banks's competency to stand trial.

## V.

Ultimately, Banks's attempts to recharacterize ministerial law enforcement functions as improper investigatory overreaching must fail, as must his deliberate but ill-conceived trial strategy to gain a successful appeal. Accordingly, we affirm Banks's convictions.

*AFFIRMED*