UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-4977

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LOUIS ANTONIO BRYANT, a/k/a Tinio, a/k/a Black, a/k/a B
Stacks,

Defendant - Appellant.

Appeal from the United States District Court for the Western
District of Virginia, at Charlottesville.  Norman K. Moon,
District Judge.  (3:04-cr-00047-NKM)

Argued:  September 26, 2008          Decided:  November 25, 2008

Before MICHAEL and MOTZ, Circuit Judges, and James C. DEVER III,
United States District Judge for the Eastern District of North
Carolina, sitting by designation.

Affirmed and remanded with instructions by unpublished per
curiam opinion.

**ARGUED:** Jonathan Lawrence Katz, Silver Spring, Maryland, for
Appellant.  Jean Barrett Hudson, OFFICE OF THE UNITED STATES
ATTORNEY, Charlottesville, Virginia, for Appellee.  **ON BRIEF:**
John L. Brownlee, United States Attorney, Roanoke, Virginia, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Louis Antonio Bryant ("Bryant") was tried by a jury in the Western District of Virginia and convicted on eight charges stemming from his leadership of a violent drug organization in Charlottesville, Virginia called "Project Crud" or "PJC." In this appeal, Bryant raises numerous challenges to his convictions and life sentence. As explained below, we remand with instructions for the district court to vacate Bryant's 21 U.S.C. § 846 conviction, but affirm his other convictions and life sentence.

I.

First, Bryant argues that the district court and the government violated his constitutional right to a speedy trial. In analyzing this argument, we must assess: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant timely asserted his right to a speedy trial; and (4) whether the defendant was prejudiced by the delay. See, e.g., Barker v. Wingo, 407 U.S. 514, 530 (1972); United States v. Hopkins, 310 F.3d 145, 150 (4th Cir. 2002).

The first factor is the length of the delay. This factor also is a threshold requirement that the defendant must meet before we may actually engage in balancing the four factors. See, e.g., Doggett v. United States, 505 U.S. 647, 651-52

2

(1992).  The defendant must show that the delay in his case was beyond the ordinary and was presumptively prejudicial.  See id.

Bryant's first trial began sixteen months after his indictment was unsealed, and his second trial began twenty-two months after his indictment was unsealed.  We assume, without deciding, that this delay is lengthy enough to show presumptive prejudice, and proceed to balance the four factors.  See, e.g., id. at 652 n.1.  However, in weighing the length of the delay, we note that we have found that longer periods of delay were not unreasonable.  See, e.g., Hopkins, 310 F.3d at 150 (concluding two-year delay was "not uncommonly long").

The second factor is the reason for the delay.  We have classified reasons for delay as "improper," "neutral," or "valid."  See United States v. Grimmond, 137 F.3d 823, 828 (4th Cir. 1998).  Improper reasons for delay weigh heavily against the government, neutral reasons weigh slightly against the government, and valid reasons weigh in favor of the government.  See id.  An example of a neutral reason is "an understaffed prosecutor's office."  See id.  Here, the government frequently moved for continuances because this multi-defendant conspiracy case was complicated.  The district court agreed that the case was complicated.  Moreover, some of the delay was due to the court accommodating defense counsel's schedule.  Ultimately, we

consider the reason for the delay to be neutral, and weigh it slightly against the government.

The third factor is whether the defendant timely asserted his right to a speedy trial. This factor may be weighed in favor of the government when the defendant waits until late in the course of events to assert his right. See, e.g., Grimmond, 137 F.3d at 829. Here, Bryant waited until May 2005, ten months after his indictment was unsealed, to assert his right. By that time, the district court had already calendared the case for trial in November 2005. Moreover, Bryant's first trial began on November 14, 2005, and ended in a mistrial on November 30, 2005. On December 16, 2005, Bryant moved to schedule his second trial no earlier than April 20, 2006. The court granted defendant's motion and scheduled the second trial for May 8, 2006. Bryant's second trial began on May 8, 2006. We weigh this factor in favor of the government.

The final factor is prejudice. Prejudice can take three forms: (1) "oppressive pretrial incarceration"; (2) "anxiety"; and (3) an impaired ability to mount a defense. See Barker, 407 U.S. at 532. The most serious form of prejudice is impaired ability to mount a defense. See id. Although Bryant was incarcerated pending his trial and doubtless suffered some anxiety while awaiting his first and second trial, nothing indicates that Bryant's ability to mount his defense suffered in

4

any respect. Notably, Bryant does not identify any witness whose memory faded, any evidence that was lost, or any similar issue. See, e.g., Grimmond, 137 F.3d at 830. Indeed, the only prejudice that Bryant alleges is his pretrial incarceration. See Appellant's Am. Sealed Br. 16–17. We conclude that this factor weighs in favor of the government.

We have carefully balanced the four Barker factors. "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." Barker, 407 U.S. at 533. We conclude that there was no violation of Bryant's Sixth Amendment right to a speedy trial.[1]

## II.

Next, Bryant challenges the jury venire, the petit jury at his second trial, and the prosecutor's use of a peremptory strike during jury selection. See Appellant's Am. Sealed Br. 17–18. Initially, we address Bryant's challenge to the jury venire.

---

[1] Bryant also raises a Speedy Trial Act claim. See 18 U.S.C. §§ 3161-3174. We have reviewed the record concerning Bryant's first trial and his second trial. In light of the "periods of delay" that are "excluded" in computing time under the Speedy Trial Act, Bryant's Speedy Trial Act claim fails. See id. § 3161(h).

The Constitution requires that a criminal defendant receive a jury venire that consists of "a fair cross section of the community." See, e.g., Taylor v. Louisiana, 419 U.S. 522, 530 (1975); United States v. Williams, 264 F.3d 561, 567 (5th Cir. 2001). According to the Supreme Court:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).

Bryant's argument concerning the jury venire fails. First, Bryant bears the burden of establishing a prima facie violation, see id., yet he does not allege, much less establish which distinctive group was systematically excluded. See Appellant's Am. Sealed Br. 17–18.

Second, assuming that Bryant is challenging the purported lack of African-Americans, he presents (and the record before us contains) no evidence that the percentage of African-Americans on the jury venire is not fair and reasonable in relation to the community as a whole. See id. Bryant leaves us to speculate about whether the venire was a reasonable representation.

6

Speculation is no substitute for evidence. See Williams, 264 F.3d at 568–69.

Even assuming that Bryant had met the first two requirements, he presents no evidence that the alleged exclusion of African-Americans on the jury venire was systematic, rather than a mere statistical anomaly. Accordingly, we reject Bryant's fair-cross-section challenge to the jury venire.

Next, Bryant challenges the racial makeup of the petit jury at his trial. Bryant, however, has no constitutional right to a fair cross-section of the community on his petit jury. See, e.g., Taylor, 419 U.S. at 538 ("[The Supreme Court] impose[s] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition . . . .").

Finally, Bryant argues that the prosecutor used a peremptory strike in a purposefully discriminatory manner and thereby violated Batson v. Kentucky, 476 U.S. 79 (1986), and its progeny. See Appellant's Am. Sealed Br. 17–18. In particular, Bryant challenges the prosecutor's decision to strike a prospective juror who, in Bryant's opinion, was Hispanic. See id.

To prevail on a Batson challenge, the defendant must first demonstrate a prima facie case of purposeful discrimination.

7

See Batson, 476 U.S. at 96. The prima facie case requires the defendant to show that the prosecutor used a peremptory strike "to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race," United States v. Martinez-Salazar, 528 U.S. 304, 315 (2000), and that the facts and circumstances surrounding the peremptory strike give rise to an inference that the prosecutor acted due to the venire member's group identity. See Batson, 476 U.S. at 96; see also Powers v. Ohio, 499 U.S. 400, 402 (1991) (extending Batson to allow challenges by defendants not of the same group of the venire member excluded).

Bryant contends that a female venire member, who self-identified as "White" on the jury questionnaire, was in fact Hispanic. See J.A. 127, 150, 152–55.[2] During jury selection, the prosecutor used a peremptory challenge to strike this prospective juror. See id. at 143. Bryant objected and argued that the prosecutor's peremptory strike violated Batson. See id. at 149–50, 152–54; Appellant's Am. Sealed Br. 17–18.

The district court considered Bryant's Batson challenge, including his contention that the woman in question was Hispanic. The district court found that she was white and that

---

[2] Citations to "J.A." refer to the joint appendix. Citations to "A.J.A." refer to the amended joint appendix.

8

the government's peremptory strike was neutral.  See J.A. 154-55.  Initially, Bryant complains that the jury questionnaire did not have a Hispanic or Latino box to check concerning race[3] and that the district court's decision concerning the juror's classification was based on how the individual in question appeared and was therefore improperly based on a stereotype.  See id. at 154 ("Your Honor, there's no such thing as a Hispanic look, especially coming from a law firm that represents a huge number of Hispanics.  It runs all the color hues of skin and hair.").  Bryant also contends that because the challenged individual had a "Hispanic last name," the district court erroneously failed to ask the individual her race.  See id. at 152, 154.

Even assuming that the challenged individual was a member of a racial or ethnic minority (e.g., a Latina), the prosecutor provided a neutral explanation for striking the prospective juror.  Specifically, when Bryant raised his Batson challenge, the prosecutor explained that he struck the individual in question because she was a school psychologist whom the government feared might be overly sympathetic to Bryant.  See J.A. 153.  This reason is a clear, specific, neutral explanation

---

[3]  The jury survey also lacked a separate question for ethnicity.  See J.A. 125–42.

for the peremptory strike.  See Batson, 476 U.S. at 97–98 & n.20.  Moreover, we have reviewed the record concerning Bryant's Batson challenge to this prospective juror.  See J.A. 148-55. The district court did not err in considering and overruling Bryant's Batson objection.

III.

Next, Bryant raises several challenges under Crawford v. Washington, 541 U.S. 36 (2004).  In Crawford, the Supreme Court held that the Confrontation Clause of the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  541 U.S. at 53–54.  Bryant contends that the district court erroneously admitted various "testimonial" statements and thereby violated the Sixth Amendment.

A.

First, Bryant argues that the district court erred in admitting the testimony of Charlottesville Police Officer Web Stokes ("Officer Stokes") in two respects.  Officer Stokes' testimony arose from an incident in which Bryant and Lorenzo Timberlake ("Timberlake") opened fire on the home of Robert Pryor ("Pryor") (another drug dealer in Charlottesville) in retaliation for Pryor's theft of drugs belonging to Project

10

Crud. See, e.g., A.J.A. 1255-75. Initially, Bryant contends that the district court erred when it allowed Officer Stokes to testify as to what Glenetta Smith, a government witness who lived near Pryor's house, said and did during a photo lineup that Officer Stokes conducted while investigating the Pryor house shooting. See, e.g., Appellant's Am. Sealed Br. 24-28.

Officer Stokes testified that shortly after the Pryor house shooting, he prepared a photo lineup and showed it to Glenetta Smith. See A.J.A. 1343. According to Officer Stokes, Glenetta Smith identified Bryant in the lineup. See id. at 1343-44. Bryant argues that Officer Stokes' testimony concerning Glenetta Smith's identification of Bryant in the photo lineup violates Crawford. See Appellant's Am. Sealed Br. 26-28.

In Crawford, the Supreme Court declined to comprehensively define what constitutes a "testimonial" statement. See Crawford, 541 U.S. at 68. However, "[w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. Further, the Court stated that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51; see also Davis v. Washington, 547 U.S. 813, 822 (2006).

We assume, without deciding, that Officer Stokes' testimony concerning Glenetta Smith's identification of Bryant was "testimonial" and violated Crawford. We next analyze whether the alleged Confrontation Clause error was harmless. See, e.g., United States v. Banks, 482 F.3d 733, 741 (4th Cir. 2007) ("We need not decide whether the district court erred [under Crawford], however, because we hold that any error would be harmless in light of the other evidence inculpating [the defendant]."); United States v. Khan, 461 F.3d 477, 496 (4th Cir. 2006) ("We do not reach the question of whether [the witness's] statements were admitted in violation of the Sixth Amendment because, to the extent that any error occurred, it was harmless.").

"[A] Confrontation Clause violation may be found harmless on appeal." Banks, 482 F.3d at 741 (citing Khan, 461 F.3d at 496; Crawford, 541 U.S. at 76 (Rehnquist, C.J., concurring in the judgment)). An error is harmless when the reviewing court can say with confidence that, after considering all that occurred, and without severing the erroneous action from the whole, the judgment was not substantially swayed by the error. Banks, 482 F.3d at 741–42; see Khan, 461 F.3d at 496; cf. Fed. R. Crim. P. 52(a).

Here, ample evidence beyond Officer Stokes' testimony concerning Glenetta Smith's identification of Bryant tied Bryant

12

to the Pryor house shooting. In particular, Timberlake provided detailed testimony to the jury about how he and Bryant fired multiple rounds into Pryor's house, including considerable details about their transit, point of attack, weapons used, and flight from the scene. See A.J.A. 1255-75. Although Bryant complains that Timberlake was a cooperating witness and was therefore unreliable, the jury was entitled to credit Timberlake's testimony. We conclude that the judgment was not substantially swayed by Officer Stokes' testimony about Glenetta Smith's identification of Bryant, even assuming (without deciding) that the district court erred in admitting the identification testimony. [4]

---

[4] Unlike a typical Crawford objection where the declarant does not testify at trial, Glenetta Smith testified at trial. In fact, Glenetta Smith testified before Officer Stokes testified. During Glenetta Smith's testimony, she mentioned that she spoke with Officer Stokes shortly after the shooting, but she did not testify about her conversation with Officer Stokes. See A.J.A. 1192. Further, during her testimony, neither the government nor Bryant asked Glenetta Smith about her identification of Bryant to Officer Stokes. Cf. Fed. R. Evid. 801(d)(1)(C). Officer Stokes testified after Glenetta Smith, and his testimony included Glenetta Smith's identification of Bryant. During Bryant's case, Bryant did not recall Glenetta Smith to testify about her alleged identification of Bryant to Officer Stokes.

The parties dispute whether Glenetta Smith was "unavailable" within the meaning of Crawford when the district court excused her following her testimony. Compare Appellant's Sealed Reply Br. 6 with Appellee's Am. Sealed Br. 44. The parties also dispute whether Bryant (through counsel) withdrew his Crawford objection to Officer Stokes' identification (Continued)

13

Next, Bryant argues that the district court erroneously allowed Officer Stokes to testify about what Glenetta Smith told him she saw on the night of the Pryor house shooting. See Appellant's Am. Sealed Br. 26–28. Officer Stokes testified that Glenetta Smith told him that she had seen "two black males, one of which was shorter and stocky and very dark-skinned, and then another one who was taller, probably over six feet, and more slender and light-skinned." See A.J.A. 1337. Bryant contends that Officer Stokes's testimony concerning what Glenetta Smith said violates Crawford. See Appellant's Am. Sealed Br. 26–28.

Again, assuming (without deciding) that Officer Stokes' testimony constitutes Crawford error, we conclude that it was harmless. Notably, before Officer Stokes testified, Glenetta Smith testified that she heard a long, loud sound like someone was beating on a trash can. See A.J.A. 1190. She then looked out of her window and saw a tall, light-skinned black male and a shorter, dark-skinned black male running away from Pryor's house towards Forest Hill Park. See id. at 1191–92. Bryant (through counsel) then cross examined Glenetta Smith about what she heard

---

testimony and thereby waived (except for plain error) his right to object. Cf. A.J.A. 1344 ("I withdraw that objection because I'm going to be crossing [Officer Stokes] about [the identification]."). Because we conclude that any error in admitting Officer Stokes' contested identification testimony was harmless, we need not decide either of these issues.

14

and saw that evening. Id. at 1192–93. Officer Stokes's testimony concerning what Glenetta Smith said to him essentially duplicated Glenetta Smith's testimony. In light of Glenetta Smith's testimony, we conclude that the judgment was not substantially swayed by Officer Stokes' testimony concerning what Glenetta Smith said to him.

B.

Next, Bryant argues that the district court erred in admitting two documents into evidence over his Crawford and hearsay objections: a record of a gun transaction and a declaration of non-records from the Internal Revenue Service. See Appellant's Am. Sealed Br. 28. First, Bryant contends that the district court erred when it admitted an ATF Form 4473 from a gun shop connected with the purchase of a .454 pistol. See id.

The dispute concerns Bryant's connection to a .454 pistol. Everette Smith (a convicted felon and drug dealer in Charlottesville) testified that he convinced Sam Jones ("Jones") (a man with no prior felony convictions) to purchase a .454 pistol for Everette Smith. See A.J.A. 1203-07, 1212–14. Everette Smith explained that, in exchange for Jones purchasing the weapon, he paid Jones $200 worth of crack cocaine. Id. at 1206. Everette Smith also testified that he accompanied Jones to the gun shop in approximately November 2003 when Jones

15

completed the paperwork to purchase the weapon and paid for the weapon. Id. at 1206-07. Everette Smith also accompanied Jones when they returned to the shop to pick up the weapon. Id. at 1207. Everette Smith testified that he later sold the .454 pistol to Bryant for two pounds of marijuana. See id. at 1212-14. Bryant (through counsel) cross examined Everette Smith. Id. at 1222-36. Sam Jones did not testify.

To corroborate Everette Smith's testimony about Jones purchasing the weapon for Smith and to help rebut the defense contention that Smith was fabricating the story about obtaining the weapon from Jones and later selling it to Bryant, the government introduced Jones' application to purchase the .454 pistol as a business record from the gun shop. See id. at 1482-88. The application is an ATF Form 4473 that Jones completed before purchasing the weapon. See id. at 1488. The government introduced the ATF Form 4473 through ATF Agent John Stoltz, who testified that he received the ATF Form 4473 from the president of the gun shop. Id. at 1482-83. As part of the government's proof, Agent Stoltz also provided an affidavit from the gun shop's president consistent with Federal Rule of Evidence

16

902(11).[5]  See id. at 1483–84.  Bryant objected at trial to the ATF Form 4473, and argues on appeal, that this document violates Crawford and Federal Rules of Evidence 802 and 805.  See id.; Appellant's Am. Sealed Br. 28.

As for the Crawford objection, the ATF Form 4473 contains Sam Jones' application to purchase a firearm.  A.J.A. 1487–88.

---

[5] Rule 902(11) provides:

Certified domestic records of regularly conducted activity.—The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record—

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Fed. R. Evid. 902(11).

Agent Stoltz explained that an ATF Form 4473 "is a firearms transaction form that is filled out at the time of purchase by all people who wish to purchase firearms. It basically lists the person's name, address, and has various questions that need to be filled out [by and regarding the purchaser] at the time of purchase." Id. at 1488. The form identifies Sam Jones as the purchaser. See id.

Even if we assume that the Form 4473 was testimonial hearsay with respect to Bryant, Everette Smith testified that he accompanied Jones to buy the weapon, watched Jones complete paperwork to buy the weapon, went with Jones to pick up the weapon at the gun shop, and later sold the weapon to Bryant. See A.J.A. 1203-07, 1212-14. Regardless of the ATF Form 4473 and regardless of the person from whom Everette Smith got the weapon, Smith's testimony tied Bryant to the weapon. Moreover, Bryant had full and fair opportunity to cross examine Everette Smith. See id. at 1222-36. Accordingly, even if admitting the Form 4473 was Crawford error, the error was harmless. See, e.g., Banks, 482 F.3d at 741–42; Khan, 461 F.3d at 496; cf. Fed. R. Crim. P. 52(a).

Bryant also argues that admitting the Form 4473 violates Federal Rules of Evidence 802 and 805 because it "contains multiple levels of hearsay." See Appellant's Am. Sealed Br. 28; see also A.J.A. 1483. The government responds that the Form

18

4473 is an admissible business record.  See Appellee's Am. Br. 40–41; Fed. R. Evid. 803(6).

Even were we to conclude that the district court erroneously admitted the Form 4473, the error was harmless. Ample evidence beyond the Form 4473 tied Bryant to the .454 pistol.  That evidence included Everette Smith's testimony that he sold the .454 pistol to Bryant in exchange for marijuana.

Next, Bryant contends that the district court erred in admitting a "certification of nonexistence of records" ("CNR") from the Internal Revenue Service ("IRS") indicating that he had not paid income taxes during times relevant to the indictment, and thus inviting the jury to draw the inference that Bryant derived his income and various assets from selling drugs.  See Appellant's Am. Sealed Br. 28.  Bryant argues that CNRs are "the very essence of testimonial evidence."  Id.

The district court considered and rejected Bryant's Crawford challenge to the IRS CNR.  See United States v. Bryant, No. 3:04-CR-47, 2006 WL 1700107, at *1–*4 (W.D. Va. June 15, 2006) (unpublished).  In rejecting the Crawford argument, the district court relied on cases from the Fifth and Ninth Circuits analyzing CNRs from Immigration and Customs Enforcement ("ICE"). See id. at *2 (citing United States v. Cervantes-Flores, 421 F.3d 825, 830–34 (9th Cir. 2005) (per curiam); United States v. Rueda-Rivera, 396 F.3d 678, 680 (5th Cir. 2005) (per curiam)).

19

Since the district court's decision, other circuit courts have concluded that ICE CNRs are nontestimonial. See United States v. Burgos, 539 F.3d 641, 644–45 (7th Cir. 2008) ("The reported cases from the other circuits that have considered the question are unanimous in holding that an alien's warrant of deportation and CNR are nontestimonial business records not subject to the requirements of the Confrontation Clause under Crawford."); accord United States v. Mendoza-Orellana, 133 F. App'x 68, 70 (4th Cir. 2005) (per curiam) (unpublished) (finding that ICE CNR admitted as self-authenticating public record was not testimonial under Crawford).

In opposition to the analysis concerning ICE CNRs, Bryant notes that this case involves an IRS CNR. See Appellant's Sealed Reply Br. 8. Bryant then argues that an IRS CNR is more likely to be inaccurate because the IRS (unlike ICE) is a huge organization responsible for keeping records on all taxpayers in America. See id.

Initially, we question the premise that the IRS is more likely to commit record-keeping errors than ICE. Certainly, nothing in the record supports this conclusion. More importantly, whether the IRS is more likely to commit record-keeping errors than ICE does not illuminate whether an IRS CNR or an ICE CNR is testimonial under Crawford. Cf. Crawford, 541 U.S. at 56 (noting that some examples of hearsay "by their

20

nature were not testimonial—for example, business records"). As to that issue, we conclude that the IRS CNR is not testimonial under Crawford. See, e.g., Burgos, 539 F.3d at 644-45; Cervantes-Flores, 421 F.3d at 830–34; Rueda-Rivera, 396 F.3d at 680; see also Udeozor, 515 F.3d at 268–70.

Alternatively, even if we assume that the district court erroneously admitted the IRS CNR, the alleged error was harmless. The government presented considerable evidence of Bryant's lavish lifestyle and absence of legitimate work history, even without the IRS CNR. See, e.g., Bryant, 2006 WL 1700107, at *3–*4 (recounting the evidence of Bryant's unexplained wealth, including $20,000 in cash found in his Cadillac Escalade). In sum, we reject Bryant's Crawford and hearsay arguments.[6]

IV.

Finally, we address one housekeeping matter. The jury convicted Bryant on eight counts, including both a drug conspiracy in violation of 21 U.S.C. § 846 (i.e., count 1), and of engaging in a continuing criminal enterprise in violation of

---

[6] Bryant (through counsel and in his pro se brief) raised numerous other arguments. We have carefully examined all of these arguments. The arguments lack merit and do not warrant further discussion.

21 U.S.C. § 848(a) and (b) (i.e., count 2).[7]  The district court sentenced Bryant to life in prison for the continuing criminal enterprise conviction, but did not impose a sentence for the section 846 conviction.  See J.A. 419.

In failing to impose a sentence on the section 846 conviction, the district court acted properly.  In Jeffers v. United States, 432 U.S. 137 (1977) (plurality opinion), a plurality of the Supreme Court held that imposing sentence on both a 21 U.S.C. § 846 conspiracy count and a 21 U.S.C. § 848 continuing criminal enterprise ("CCE") count was improper, because Congress did not intend cumulative penalties under section 846 and section 848.  See 432 U.S. at 156 ("Section 848 itself reflects a comprehensive penalty structure that leaves little opportunity for pyramiding of penalties from other sections of the Comprehensive Drug Abuse Prevention and Control

---

[7]  Bryant was convicted of (1) conspiracy to distribute or possess with intent to distribute 50 grams or more of cocaine base, 5 kilograms or more of powder cocaine, and marijuana (21 U.S.C. §§ 846, 841(a)(1), 859, 860, and 861); (2) engaging in a continuing criminal enterprise (21 U.S.C. § 848 (a) and (b)); (3) conspiracy to conduct and participate in a racketeer influenced and corrupt organization (RICO) (18 U.S.C. § 1962(d)); (4) possession with intent to distribute marijuana (21 U.S.C. § 841 (a)(1)); (5) possession of a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)); (6) attempted murder, violent crime in aid of racketeering activity (18 U.S.C. §§ 2 and 1959(a)(5)); and (7) two counts of threat to murder, violent crime in aid of racketeering activity (18 U.S.C. §§ 2 and 1959(a)(4)).  See J.A. 417-18.

22

Act of 1970."); see also Rutledge v. United States, 517 U.S. 292, 300 (1996) ("For the reasons set forth in Jeffers, . . . we hold that this element of the CCE offense requires proof of a conspiracy that would also violate § 846.  Because § 846 does not require proof of any fact that is not also a part of the CCE offense, . . . conspiracy as defined in § 846 does not define a different offense from the CCE offense defined in § 848.").  We have applied Jeffers to require that, where a defendant is convicted of both a section 846 count and a section 848 count, the section 846 conviction must be vacated.  See, e.g., United States v. Heater, 63 F.3d 311, 318 (4th Cir. 1995); United States v. Porter, 821 F.2d 968, 978 (4th Cir. 1987) ("Congress did not intend that an individual be punished under both § 846 . . . and § 848 . . . .").  In this case, Heater applies.  Thus, as in Heater, "[w]e need only take the next step and instruct the district court to vacate the conspiracy conviction itself." 63 F.3d at 318.

V.

For the reasons explained above, we affirm Bryant's convictions and sentence.  Because we affirm Bryant's 21 U.S.C. § 848 conviction, we remand this action with instructions for

23

the district court to vacate Bryant's 21 U.S.C. § 846 conviction.  We affirm the balance of the judgment.

AFFIRMED AND REMANDED WITH INSTRUCTIONS