**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-4331**

───────────────

UNITED STATES OF AMERICA,

           Plaintiff − Appellee,

    v.

CRISTIAN CABRERA-RIVAS, a/k/a Christian Cabrera-Rivas, a/k/a Christian Alberto Lopez,

           Defendant – Appellant.

───────────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge; David C. Keesler, Magistrate Judge. (3:19−cr−00235−RJC−DCK−2)

───────────────

Argued:  October 29, 2024                          Decided:  June 30, 2025

───────────────

Before DIAZ, Chief Judge, and WYNN and THACKER, Circuit Judges.

───────────────

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Thacker joined in full, and Judge Wynn joined in part.  Judge Wynn wrote an opinion concurring in part, dissenting in part, and dissenting from the judgment.

───────────────

**ARGUED:**  James Walter Kilbourne, Jr., ALLEN STAHL & KILBOURNE, PLLC, Asheville, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

───────────────

DIAZ, Chief Judge:

A jury found Cristian Cabrera-Rivas guilty of two drug offenses arising from a meth deal gone awry. Cabrera-Rivas urges us to vacate his conviction on various grounds, but none avail him. We affirm.

## I.

Because the government prevailed before the district court, we recount the facts "in the light most favorable to the government." *United States v. Haas*, 986 F.3d 467, 477 (4th Cir. 2021).

## A.

Cabrera-Rivas grew up in Honduras. His formal schooling ended in third grade; he started working at age seven. He likely has a learning disability, and he doesn't speak fluent English. In the years before his arrest, Cabrera-Rivas lived and worked in Charlotte, North Carolina. By 2018, he had a side business peddling powder cocaine—and knew others who sold meth.

That year, Cabrera-Rivas met a man who introduced himself as "Hector." Hector was a confidential informant for the Department of Homeland Security. Hector's handler at DHS was Agent Ubaldo Rios.

In January 2019, Hector met Cabrera-Rivas again. Over the course of fourteen recorded phone calls, they negotiated a methamphetamine deal. In his first recorded call, Cabrera-Rivas claimed he knew a meth dealer—a "dude from Texas"—who would bring Hector whatever Hector wanted to buy. S.A. 1. Cabrera-Rivas proposed that Hector pay

$12,000 per kilogram of crystal meth, represented that price as "the deal" that he had, and offered to sell Hector five kilos.  S.A. 2, 4.

Cabrera-Rivas called back half an hour later.  His contact had said that five kilograms was "too many" and that his contact would arrive with two kilos to start.  S.A. 6. Hector asked for a bulk discount.  Cabrera-Rivas responded that Hector should buy the two kilograms first; Cabrera-Rivas, apparently, could "get the dude to come down on the price" "later."  S.A. 7.  The next evening, Cabrera-Rivas told Hector that his "dude confirmed" the sale.  S.A. 18.

The morning of the deal, Cabrera-Rivas called to arrange his meeting with Hector. Cabrera-Rivas vouched for his contact, who'd "always been straight" with him, and he said his contact had "told [him] that if you're straight with him like [Cabrera-Rivas was], he'll work with you whenever you want."  S.A. 24.

Hector and Agent Rios met Cabrera-Rivas in their chosen restaurant.  Rios asked whether the product was good.  Cabrera-Rivas responded that Rios could "look at it now. And you will see that I haven't touched it.  Truth be told, I was just giving [my contact] a hand."  S.A. 27.

Hector, Cabrera-Rivas, and Agent Rios walked outside, where they met the contact, Marco Ramos-Garcia.  Ramos-Garcia was sitting in a minivan with his wife, Sylvia Hernandez, and their children.  Rios greeted Ramos-Garcia and asked to see the product.

Ramos-Garcia opened his driver-side door, and Hernandez passed a white garbage bag up to Rios.  Inside the bag were two plastic Tupperware containers.  Rios popped one open to examine the meth inside.

3

After approving of the crystal meth, Agent Rios asked Ramos-Garcia how to order more. Ramos-Garcia responded that "[h]owever you want to order, you just let me know with the guy and that's it." S.A. 41. Rios pulled Cabrera-Rivas aside to fetch the money for the deal and asked Cabrera-Rivas how often their deals could take place. Cabrera-Rivas answered that "we will" provide some "every 15 days or every week. . . . If you want, I'll send this guy right now." S.A. 42.

Just then, the police arrived. They ordered Cabrera-Rivas to "get on the ground," but Cabrera-Rivas took off "running toward the restaurant," where police apprehended him. J.A. 302. The police seized $3,359 in cash from Cabrera-Rivas and took custody of the two plastic tubs, which contained nearly pure meth.

Later that day, Cabrera-Rivas was interviewed by police officer Michael Vargas. Although the interview was recorded, it was automatically erased after seven days without being "burned onto a CD in time." J.A. 342. Officer Vargas later recalled that Cabrera-Rivas said he'd met Hector about a week before. As Vargas remembered things, Cabrera-Rivas said Hector had asked him how to buy some meth, and Cabrera-Rivas responded that "he knew someone that could" provide some. J.A. 348. In that interview, Cabrera-Rivas called himself "a facilitator for the deal." J.A. 348.

### B.

Cabrera-Rivas was indicted on one count of conspiring to possess and distribute over fifty grams of methamphetamine and one count of possessing over fifty grams of methamphetamine with intent to distribute. *See* 21 U.S.C. §§ 841, 846. Soon after, Cabrera-Rivas gave notice of his intent to present a public authority defense. He also

4

requested (and received) a hearing on his competency to stand trial. *See* 18 U.S.C. § 4241(a).

Government psychologist Ashley Jenkins evaluated Cabrera-Rivas and concluded that he was competent. Cabrera-Rivas hired his own forensic psychologist, Sean Knuth. Knuth didn't evaluate Cabrera-Rivas, and he expressed no views on Cabrera-Rivas's competency. Knuth's opinion instead focused on purported flaws in Jenkins's report.

To bolster his case for incompetency, Cabrera-Rivas filed a declaration from his wife, Victoria Rivera. There, Rivera said that Cabrera-Rivas "exhibited irrational and violent behavior" throughout their four-year marriage. J.A. 48. In her view, Cabrera-Rivas was quick to anger and eager to fight, and he couldn't process "day-to-day and social interactions in a normal or healthy way." J.A. 49.

A magistrate judge presided over the competency hearing. Cabrera-Rivas's counsel took the stand first. Counsel described Cabrera-Rivas's behavior as "pretty erratic" and "very agitated." J.A. 62–63. He would "get very upset," she said, whenever his lawyers tried to explain legal concepts, and once "he got very agitated and got up and began to pace the room and pace around behind us," making counsel and her colleague "very uncomfortable." J.A. 63. Counsel struggled to communicate with Cabrera-Rivas, and she thought that he didn't understand basic legal concepts. A paralegal confirmed Cabrera-Rivas's anger issues.

Jenkins took the stand and drew a different picture. She'd met with Cabrera-Rivas five times for a total of ten hours. She described him as "cooperative" and noted no behavior issues. J.A. 89. Jenkins explained that Cabrera-Rivas performed very poorly on

5

a standardized test of intelligence that she'd administered.  In her view, Cabrera-Rivas probably scored low because of his mere three years of formal education in Honduras.

Jenkins administered a second test, one that would assess Cabrera-Rivas's "personality and . . . psychological function or dysfunction."  J.A. 94.  But the results of that test were unhelpful: Cabrera-Rivas's atypical answers resulted in "highly elevated" scores that could not be sensibly interpreted.  J.A. 95.  His scores were so high that they raised "a question of possibly malingering," although Jenkins doubted Cabrera-Rivas was faking the results.  J.A. 95.

Ultimately, Jenkins found that Cabrera-Rivas "understood what he was charged with"—in "his own words, . . . he was charged with helping to do a drug sale." J.A. 100–01.  He told her that he was "having some difficulties communicating with his attorney and suggested that might be why he was sent for the evaluation."  J.A. 99.

As Jenkins saw it, Cabrera-Rivas understood legal concepts when she explained them "in a simplified fashion."  J.A. 102.  But he felt "rushed" by his translator and lawyers, and he was "very frustrated and upset" at his situation.  J.A. 135.  Cabrera-Rivas, Jenkins said, knew that he was a defendant; that the prosecutor wanted to put him "in jail"; and that a trial involved attorneys, judges, and juries.  J.A. 104–05.  When Jenkins discussed deportation with Cabrera-Rivas, he wept and "talked about his regret."  J.A. 136.

The magistrate judge found Jenkins's testimony credible.  He credited Knuth's testimony, too—including Knuth's admission that Jenkins's report "provide[d] a basis for a competency opinion."  J.A. 737.  The judge concluded that Cabrera-Rivas hadn't shown he was incompetent by a preponderance of the evidence.

Cabrera-Rivas didn't object to the magistrate judge's decision, and he never asked the district judge to review it.

C.

Cabrera-Rivas proceeded to trial. There, Officer Vargas testified about his interview with Cabrera-Rivas. Vargas admitted that even though the interview was taped, the recording wasn't downloaded from the server in time to avoid being automatically erased.

Defense counsel complained that possibly exculpatory evidence had been destroyed and asked that Vargas's testimony be suppressed. After a sidebar, the district court said that it had heard no "evidence of bad faith" and admitted Vargas's testimony. J.A. 343–44.

Cabrera-Rivas moved for a judgment of acquittal at the close of the government's case in chief, which the district court denied. It found that sufficient evidence supported the conspiracy charge—the evidence that Cabrera-Rivas and Ramos-Garcia had worked together to sell meth. And it found sufficient evidence on the possession charge because, it said, Cabrera-Rivas acted jointly with Ramos-Garcia and thus Cabrera-Rivas constructively possessed the drugs that Ramos-Garcia distributed.

The district court then precluded Cabrera-Rivas from offering "public authority" and "innocent intent" affirmative defenses,[1] but it did permit him to testify that he'd been entrapped. J.A. 368–69. The prosecution asked the district court to instruct the jury on the

---

[1] We discuss these defenses in more detail later.

7

defense of "classic entrapment" rather than "entrapment by estoppel," and Cabrera-Rivas's counsel agreed that his defense "certainly [would] be classic entrapment."[2] J.A. 370–72.

Cabrera-Rivas took the stand. He told the jury that he knew that Hector was an informant, and that Hector had told him that "in six months if I could get, you know, drugs for the boss [Agent] Rios, that he could get me basically a permit" that would grant Cabrera-Rivas legal immigration status. J.A. 384. In his own words, he "was doing everything for [the] papers." J.A. 398.

The jury convicted Cabrera-Rivas on both counts.

### D.

After trial, Cabrera-Rivas renewed his motion for a judgment of acquittal and, in the alternative, asked for a new trial. He argued that the evidence didn't suffice to convict him on both counts of the indictment, and that he'd been entrapped. And he argued (as relevant here) that the government's destruction of the Vargas recording warranted a new trial. Cabrera-Rivas also moved for a retrospective competency hearing, asserting that his behavior at trial showed he was "unable to comprehend the proceedings." J.A. 551.

---

[2] The "classic" entrapment defense would require Cabrera-Rivas to show that the government induced him to commit his crimes, after which the government would have to prove beyond a reasonable doubt that Cabrera-Rivas was predisposed to criminality. *United States v. Young*, 916 F.3d 368, 375–76 (4th Cir. 2019).

Entrapment by estoppel, on the other hand, is more closely related to the public authority defense than it is to ordinary entrapment. *United States v. Li*, 475 F. Supp. 2d 590, 592 n.4 (E.D. Va. 2007). Proving entrapment by estoppel would require Cabrera-Rivas to show (1) that the government assured him "that certain conduct is lawful"; (2) that Cabrera-Rivas engaged in that conduct "in reasonable reliance on those assurances"; (3) and that the government prosecuted him for what it had said was allowed. *United States v. Marshall*, 332 F.3d 254, 262 (4th Cir. 2003).

8

The district court denied relief.

First, the district court noted, based on its personal observations, that Cabrera-Rivas's answers on the stand were "cogent[]," that he "answered appropriately" when questioned, and that defense counsel reported no "lack of understanding or assistance" during jury selection. J.A. 631. The court denied a retrospective competency hearing.

Next, the court found that Cabrera-Rivas's "statements in recorded telephone calls" allowed the jury to find that he'd "conspired with a drug supplier in Texas and [Ramos-Garcia] to distribute 2 kilograms of methamphetamine for $24,000, and that [Cabrera-Rivas] constructively possessed the methamphetamine with intent to distribute when he instructed [Ramos-Garcia] when and where to deliver the drugs." *United States v. Cabrera-Rivas*, No. 3:19-cr-235, 2022 WL 68767, at *1 (W.D.N.C. Jan. 6, 2022).

Finally, the district court denied a new trial for destruction of the Vargas tape because Cabrera-Rivas hadn't shown "actual bad faith." *Id.* at *2.

This appeal followed.

## II.

Cabrera-Rivas starts by challenging the district court's competency decisions. He contends that the magistrate judge erred by finding him competent, and the district court erred by denying him a second competency hearing.

### A.

We start with the magistrate judge's finding of competency, which we review for clear error. *United States v. Roof*, 10 F.4th 314, 341 n.8 (4th Cir. 2021).

9

1.

The government contends that we have no jurisdiction to review the magistrate judge's competency order because Cabrera-Rivas didn't object to it.  We disagree.  The government's cited authorities, Appellee's Br. at 40, stand for the uncontroversial point that we lack jurisdiction over appeals directly from a magistrate judge's order.  *See, e.g.*, *United States v. Stamper*, No. 17-4412, 2017 WL 11681314, at *1 (4th Cir. Dec. 12, 2017).  Magistrate judge orders, after all, aren't "final decisions of the district courts."  28 U.S.C. § 1291.  But Cabrera-Rivas appealed from his final judgment of conviction, *see* J.A. 692, and a notice of appeal that designates a final judgment "encompasses all orders that . . . merge into the designated judgment," whether or not those orders can be independently appealed.  Fed. R. App. P. 3(c)(4).

In truth, the government's argument is that Cabrera-Rivas didn't properly preserve the competency issue.  Failure to preserve doesn't affect our jurisdiction.  Otherwise, plain-error review would be unlawful.  Instead, we agree with the Sixth Circuit that courts "retain[] subject matter jurisdiction over [an] appeal regardless of the untimely filing or nonfiling of objections" to a magistrate judge's decision.[3]  *Kent v. Johnson*, 821 F.2d 1220, 1222–23 (6th Cir. 1987) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).  We may review the magistrate judge's order on the assumption that Cabrera-Rivas preserved his objection.

---

[3] The Fifth and Eleventh Circuits hold that "if the district court had no opportunity to 'effectively review the magistrate's holding' at the request of the wronged party, [appeals courts] lack jurisdiction to hear an appeal of the merits of that holding," even when a party appeals from a final judgment.  *United States v. Schultz*, 565 F.3d 1353, 1359 (11th Cir. 2009) (quoting *United States v. Renfro*, 620 F.2d 497, 500 (5th Cir. 1980)).  We find *Kent*'s rule more persuasive.

2.

Cabrera-Rivas was competent to stand trial if he had a "sufficient present ability to consult with his lawyer with a sufficient degree of rational understanding and [had] a rational as well as a factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (cleaned up).

This rule doesn't mean Cabrera-Rivas had to work well with his lawyers. It means he had to have "the *capacity* to understand, the *capacity* to assist, and the *capacity* to communicate with his counsel." *Bell v. Evatt*, 72 F.3d 421, 432 (4th Cir. 1995). "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000).

It wasn't clear error to find, as the magistrate judge did, that Cabrera-Rivas had not proven incompetency. Cabrera-Rivas's only affirmative evidence came from his attorneys and his wife. It is not clearly wrong to conclude that their testimony showed an angry and frustrated man, not an incapacitated one.

Cabrera-Rivas criticizes Dr. Jenkins's methods. But he forgets that the government wasn't required to put on evidence of competency. It's the defendant's obligation to prove incompetency by a preponderance of the evidence. *Roof*, 10 F.4th at 341.

Dr. Jenkins testified that Cabrera-Rivas understood what was happening; he just had trouble working with his lawyers. We have no reason to doubt the trial court's finding that Jenkins testified credibly. And Cabrera-Rivas's affirmative evidence—the testimony of his lawyers and his wife—didn't contradict Jenkins's conclusion, let alone refute it.

11

We're thus not left with a "definite and firm conviction that a mistake has been committed," as the clear error standard requires. *Cooper v. Harris*, 581 U.S. 285, 309 (2017) (quotation omitted).

## B.

Cabrera-Rivas attacks the magistrate judge's competency ruling with another theory. He argues that the magistrate judge wasn't authorized by Congress to finally decide his competency.

The issue that Cabrera-Rivas raises is important, but it wasn't preserved. Cabrera-Rivas didn't question the magistrate judge's authority in the district court or in his opening brief. That's forfeiture, so we review for plain error and find none.

## 1.

The Federal Rules of Criminal Procedure allow magistrate judges to participate in criminal cases in one of two ways.

Magistrate judges may "determin[e]" by "oral or written order" "any matter that does not dispose of a charge or defense." Fed. R. Crim. P. 59(a). A district judge may "modify or set aside" such an order only if it "is contrary to law or clearly erroneous." *Id.*

Magistrate judges can also issue "a recommendation" on "a defendant's motion to dismiss or quash an indictment or information, a motion to suppress evidence, or any matter that may dispose of a charge or defense." *Id.* 59(b)(1). "The district judge must consider de novo any objection to the magistrate judge's recommendation." *Id.* 59(b)(3). The Federal Magistrates Act encodes a similar distinction. 28 U.S.C. § 636(b)(1).

12

Cabrera-Rivas argues that a magistrate judge's competency ruling is effectively a ruling that resolves a dispositive matter before the court. As Cabrera-Rivas sees it, the magistrate judge should have filed a report and recommendation under Rule 59(b) instead of an order under Rule 59(a). That error, he complains, deprived him of "the review of an Article III judge." Appellant's Suppl. Br. at 7.

This argument is forfeited twice over.

First, Rule 59 and the Federal Magistrates Act require parties to object to a magistrate judge's order within fourteen days, whether the magistrate judge issued an order or a report and recommendation. Fed. R. Crim. P. 59(a), (b)(2); 28 U.S.C. § 636(b)(1). Failure to do so means the objection is forfeited. *United States v. Benton*, 523 F.3d 424, 428 (4th Cir. 2008); *United States v. Midgette*, 478 F.3d 616, 621 (4th Cir. 2007). Cabrera-Rivas never objected to the magistrate judge's order—not to challenge the magistrate judge's findings, and certainly not to challenge the magistrate judge's authority.

Second, Cabrera-Rivas never said anything about the magistrate judge's authority in his merits briefs. He didn't challenge it in his opening brief; there, he focused on the magistrate judge's substantive findings. And he didn't bring it up in his reply brief, either; there, he argued that competency cannot be waived.

We have a word for that situation: forfeiture. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017); *United States v. Smith*, No. 23-4242, 2025 WL 227717, at *6 (Jan. 17, 2025). So we review for plain error. *United States v. Caldwell*, 7 F.4th 191, 211 (4th Cir. 2021).

13

2.

To get around plain error, Cabrera-Rivas presses (and our dissenting colleague agrees) that competency questions can't be waived or forfeited. In his view, if a defendant lacks competency to be tried, then that defendant is incompetent to object to a finding of his own competency. Reply Br. at 5. To that end, Cabrera-Rivas insists that "conviction of an accused person while he is legally incompetent violates due process," full stop. *Id.* (quoting *Pate v. Robinson*, 383 U.S. 375, 378 (1966)). That means, he says, that he can object to the magistrate judge's powers whenever he likes.

Cabrera-Rivas's premise is true, so far as it goes. Courts have a duty to monitor competency, and they can't shirk it because a defendant failed to object to his own mental fitness. As the Supreme Court explained in *Pate*, a stricter procedure wouldn't protect an incompetent defendant's right to due process of law. 383 U.S. at 378. "[I]t is contradictory," the *Pate* court said, "to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Id.* at 384.

That isn't at all what happened here. Cabrera-Rivas didn't forfeit his right to a competency hearing. He asked for such a hearing, and the magistrate judge gave him one. What he forfeited instead was his right to challenge the magistrate judge's powers.[4]

---

[4] The dissent asks how an incompetent defendant could knowingly "forfeit his right to Article III adjudication of his competency." *Infra* at 37 (opinion of Wynn, J.). That proves too much. On the dissent's rule, no argument could be forfeited once competency came into question.

14

The dissent accuses us of holding that "forfeiture applies to a claim about competency on direct appeal." *Infra* at 32, 54 (opinion of Wynn, J.). Not so. Because we affirm the magistrate judge's competency decision on the merits, we see no need to decide whether the Due Process clause permits plain-error review of competency rulings. The scope of the Federal Magistrates Act is, at best, tangentially related to the merits of the competency order the magistrate judge entered.

3.

Now we apply the plain-error standard. We will reverse on unpreserved grounds only if we find (1) an error (2) which is plain and (3) which affects substantial rights. *Greer v. United States*, 593 U.S. 503, 507 (2021). Even then, we will grant relief only if (4) "the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Id.* at 508 (cleaned up).

We rest on "substantial rights."[5] To meet that third prong of the plain-error test, "there must be a reasonable probability that, but for the error, the outcome of the proceeding

---

Consider Part V.D. of our opinion, where we hold that Cabrera-Rivas waived the affirmative defense of entrapment by estoppel. On our colleague's rule, that waiver should have been impossible—how could an incompetent defendant knowingly give up a defense? Yet our colleague joins Part V.D.

[5] Though the "substantial rights" prong alone defeats plain error, we also doubt that the fairness or integrity of the federal courts would suffer in the eyes of the public were we to find otherwise. The magistrate judge's decision here served justice—so much so that the dissent can't bear to attack its reasoning directly.

The dissent submits that this prong is "unnecessary," since considering it would "'incorrectly suggest that some action (or inaction)'" by the defendant could create authority that a decision-maker lacks. *See infra* at 41 (quoting *Nguyen v. United States*, 539 U.S. 69, 80 (2003)). The very next sentence of *Nguyen* explains why that's wrong. In

would have been different." *Id.* at 507–08 (cleaned up). Here, there is none, and Cabrera-Rivas (who "bears the burden of persuasion") points to nothing to persuade us otherwise. *United States v. Olano*, 507 U.S. 725, 734 (1993). Had the magistrate judge proceeded by report and recommendation instead of by order, the result would be just the same—Cabrera-Rivas would fail to object, and the district court wouldn't review the report.[6]

The dissent evades this problem by supposing that there's been no "valid" finding that Cabrera-Rivas is competent to stand trial. *Infra* at 32, 37, 53. But that ignores the Supreme Court's instruction, in case after case, that we ask what would have happened "but for the error." *Greer*, 593 U.S. at 508; *Rosales-Mireles v. United States*, 585 U.S. 129, 134 (2018); *Olano*, 507 U.S. at 734.

The dissent's contrary position distorts what happened in the district court. As our colleague sees it, the magistrate judge's order was "ultra vires," "void," a nullity. *See, e.g.*, *infra* at 39, 42, 49. But the magistrate judge held a hearing, considered the evidence, and

_____

*Nguyen*, the parties couldn't opt in to a wrongly constituted appellate panel even by "*express*[] stipulat[ion]." 539 U.S. at 80. But magistrate judges are "critically" different: parties can empower them by consent. *Peretz v. United States*, 501 U.S. 923, 932 (1990). *Nguyen*'s premise doesn't apply here, so neither does *Nguyen*'s conclusion.

[6] Our dissenting colleague muses that Cabrera-Rivas's counsel might have chosen to object had he known that the magistrate judge's order would be reviewed de novo rather than for clear error. *Infra* at 39–40. But Cabrera-Rivas's own briefs undermine that contention. The magistrate judge's order issued on a Thursday, and Cabrera-Rivas's trial began the next Monday—too soon, his counsel says, for an objection to be possible. Reply Br. at 4. Counsel, it seems, made a strategic choice to spend the weekend preparing for trial. And it's sheer speculation to say that a different standard of review would have altered that calculus. Substantial-rights analysis should turn on "record evidence," not guesswork. *United States v. Dominguez Benitez*, 542 U.S. 74, 83–84 (2004).

issued a decision.  Cabrera-Rivas had a day in court, no matter how firmly our colleague insists he did not.  We're not deciding competency "in the first instance." *Id.* at 32.

If Cabrera-Rivas wanted review by an Article III judge, all he had to do was ask.  Because he didn't, the magistrate judge's choice to proceed by order rather than recommendation changed nothing.  The plain-error test isn't met, and Cabrera-Rivas's challenge to the magistrate judge's powers fails.

## C.

### 1.

Finally, we address Cabrera-Rivas's claim that the district court erred by denying him a post-trial competency hearing.  A court must order such a hearing if it finds "reasonable cause to believe" that a defendant presently lacks competency to stand trial. 18 U.S.C. § 4241(a).  We review such a "procedural competency" decision for abuse of discretion.  *United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007).

The "hallmark of abuse-of-discretion review" is "deference."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997); *see United States v. Smith*, 21 F.4th 122, 138 (4th Cir. 2021).  If the district court "applied the correct legal standard and offered substantial justification for its finding" without making "a clearly erroneous assessment of the evidence," it abused nothing, and we must affirm.  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) (internal quotation omitted); *see Pierce v. N.C. State Bd. of Elecs.*, 97 F.4th 194, 210 (4th Cir. 2024).

Cabrera-Rivas claims that his trial testimony was rambling and at times non-responsive.  He faults the district court for "appl[ying] its judgment to personal

17

observations made at trial" and insists that the district court must not have (but should have) decided that Cabrera-Rivas would "remain competent . . . through sentencing." Appellant's Br. at 30.

We reject these contentions. Cabrera-Rivas argued to the district court that his conduct during trial cast doubt on his competency, so it was only proper for the district court to respond by focusing on that conduct.

The court found that although Cabrera-Rivas didn't always give direct answers during his testimony, nothing suggested that he couldn't understand what was happening around him. There was no clear error in that factual conclusion, nor was there anything "arbitrary" or "capricious" in the district court's "exercise of discretion" to deny a second competency hearing. *Banks*, 482 F.3d at 743 (quotation omitted).

2.

Our dissenting colleague believes otherwise. *See infra* at 43.

We share considerable common ground with the dissent's view of the law. All three of us agree, for instance, that when a defendant asks for a second competency hearing based on new evidence, it's the new evidence that must call competency into question. *Id.* at 50. We agree that the new evidence ought to be considered holistically, "aggregate[d]" with whatever came before. *Id.* And we agree that district courts should consider "the record as a whole" and "accept as true all evidence of possible incompetence." *United States v. Mason*, 52 F.3d 1286, 1290 (4th Cir. 1995) (quotation omitted).

Our disagreement is not on the governing standard but on its application to this case. The dissent identifies no legal rule that the district court misstated, and no clearly erroneous

18

facts that the district court relied on (or failed to take as true). The dissent simply would have weighed the facts differently.

Our colleague suggests that the district court misapplied the law by relying on the magistrate judge's competency finding. *See infra* at 49. But how was the district court to know it couldn't do so? Cabrera-Rivas never argued to the district court that the magistrate judge's order was invalid. He never even objected to the merits of the magistrate judge's findings. We decline to transform lack of clairvoyance into abuse of discretion.

Perhaps we, like the dissent, would have ordered a retrospective competency hearing were we in the district court's shoes. But we weren't at the trial. We didn't hear Cabrera-Rivas's testimony. We had no chance to see him in the flesh. In situations like this, the standard of review tells us how to proceed: with deference.

III.

Cabrera-Rivas next argues that the government's evidence was insufficient to convict him.

We won't overturn a jury verdict so long as, viewing the evidence in the light most friendly to the government, the verdict is grounded by substantial evidence. *Haas*, 986 F.3d at 477. That's a purely legal question, and we must find the evidence substantial if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (cleaned up).

19

A.

We begin with Cabrera-Rivas's conspiracy charge. To prove that offense, the government had to show "(1) an agreement to possess [drugs] with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc).

Cabrera-Rivas argues that the government couldn't prove that he joined in a conspiracy because his "uncontroverted testimony" was that he thought he was collaborating with the government. Appellant's Br. at 35. According to Cabrera-Rivas, he didn't act "in furtherance of the conspiracy to sell drugs, but rather in furtherance of the Government's scheme to arrest drug dealers." *Id.* at 36.

The problem with this argument is that Cabrera-Rivas offered no evidence of his intent other than his own words. And juries don't have to believe testimony from self-interested defendants; instead, they can infer intent from circumstantial evidence. *See United States v. Tillmon*, 954 F.3d 628, 640–41 (4th Cir. 2019).

Cabrera-Rivas also argues that he can't be convicted for conspiring "only with a government agent." Appellant's Br. at 33. That's true enough, but there was more than enough evidence that Cabrera-Rivas conspired with Ramos-Garcia. How else could Cabrera-Rivas have set up the deal?

The jury could reasonably have discredited Cabrera-Rivas's self-serving testimony and judged Cabrera-Rivas by his words and actions during the drug deal. And relying on that evidence, the jury could have found beyond a reasonable doubt that Cabrera-Rivas

20

intended to source meth for Hector and Rios and formed an agreement with Ramos-Garcia to that end. That's enough to affirm Cabrera-Rivas's conspiracy conviction.

## B.

Cabrera-Rivas's possession charge presents a harder question. He argues that he didn't possess any methamphetamine—he never touched Ramos-Garcia's meth, never exercised control of it, and never knew much about the meth trade. The government responds that there's sufficient evidence to find that Cabrera-Rivas constructively possessed the meth that Ramos-Garcia brought to sell to Rios and Hector.

Ultimately, we agree with the government.

People often don't have literal, physical possession of all the things they own or control at any given time. Thus, we've long interpreted possession statutes to criminalize both actual, caught-red-handed possession and constructive possession. *See United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021) (drugs); *Henderson v. United States*, 575 U.S. 622, 626 (2015) (guns).

In other words, we've said, a jury can infer that a defendant possessed contraband if the defendant had "ownership, dominion, or control over the contraband or the [place] in which [it] was concealed" together with knowledge of its presence. *Moody*, 2 F.4th at 189 (quoting *United States v. Herder*, 594 F.3d 352, 358 (4th Cir. 2010)); *see Henderson*, 575 U.S. at 630.

We've shied away from bright-line rules when we've considered what's enough to prove possession. Mere proximity is not enough. *See United States v. Blue*, 957 F.2d 106, 108 (4th Cir. 1992). Neither is association with the illicit thing's true owner. *United States*

21

*v. Samad*, 754 F.2d 1091, 1096 (4th Cir. 1984). Rather, because we've said that "the totality of the circumstances" matters, various facts can show that contraband belongs to the defendant. *Herder*, 594 F.3d at 358.

We have considered when a jury can infer possession if a defendant acts with others to move a single mass of drugs together. Consider *United States v. Laughman*, 618 F.2d 1067 (4th Cir. 1980). In that case, police officers spotted a group of men on a sailboat that was "moving 'very quietly' and without running lights." *Id.* at 1071. Officers saw three rubber boats leaving the sailboat with "large mounds of indistinguishable cargo." *Id.* The rubber boats docked, the cargo vanished, and "the engines of several trucks started up." *Id.*

When the police investigated, they found that the sailboat and two of the rubber boats contained "a large amount of what appeared to be marijuana residue." *Id.* Inside the trucks themselves, the officers found more than two tons of marijuana. *Id.*

On appeal, some defendants challenged their possession convictions. We acknowledged that the defendants, all party to one overarching scheme, "may not have had actual physical possession" of the marijuana "when they were apprehended." *Id.* at 1077. But because "all of the [defendants] were engaged in a concerted effort to transport and distribute" the marijuana, "they each retained an interest in and dominion over" the entire hoard. *Id.* Circumstantial evidence confirmed that all the defendants "shared in the [illegal] undertaking," so we found sufficient evidence that each of them constructively possessed the marijuana. *Id.*

22

A *Laughman*-like inference of a joint venture undergirds other cases where possession by a drug dealer has been used to infer possession by the broker of the deal. The rule distilled from cases of that kind was aptly stated by the Second Circuit:

> [A] person who is sufficiently associated with the persons having physical custody so that he is able, without difficulty, to cause the drug to be produced for a customer can also be found by a jury to have dominion and control over the drug, and therefore possession. On the other hand, the casual facilitator who knows that a given principal peddles narcotics, but who does not have a working relationship with that principal which would enable him to assure delivery, lacks dominion and control and does not have possession.[7]

*United States v. Hernandez*, 290 F.2d 86, 90 (2d Cir. 1961) (citations omitted).

We think there was enough evidence here to show that Cabrera-Rivas constructively possessed the meth that Ramos-Garcia tried to sell. Cabrera-Rivas arranged for delivery of the meth; he guaranteed its price; he promised Hector that he could arrange delivery of more; he told Hector that "we sent that other dude to Texas to pick up what you ordered"; and he said to Rios that he could "send" Ramos-Garcia to pick up more meth "right now."

This evidence could persuade a reasonable jury that Cabrera-Rivas had some control over Ramos-Garcia's actions. At the very least, a jury could conclude beyond a reasonable doubt that Cabrera-Rivas was "engaged in a concerted effort to transport and distribute" the two kilograms of meth, as we found in *Laughman*. 618 F.2d at 1077. A jury could also find that Cabrera-Rivas had a "working relationship" with Ramos-Garcia that "would

---

[7] *Hernandez*, as well as the cases it cites, interpreted the Narcotic Drugs Import and Export Act's ban on "possession of . . . narcotic drug[s]." 21 U.S.C. § 174 (1964); *see Hernandez*, 290 F.2d at 88. The Controlled Substances Act repealed that ban and replaced it with what's now 21 U.S.C. § 841. Pub. L. No. 91-513 § 1101(a)(2), 84 Stat. 1242, 1291 (1970); *id.* § 401, 84 Stat. at 1260–62. Cases interpreting the Narcotic Drugs Act therefore inform, but don't control, our interpretation of the Controlled Substances Act.

23

enable" Cabrera-Rivas "to assure delivery," as the Second Circuit explained would suffice in *Hernandez*. 290 F.2d at 90.

Were Cabrera-Rivas nothing but an arm's-length broker, we would hesitate to affirm. But that's not this case. Because a jury could conclude beyond a reasonable doubt that Cabrera-Rivas was in on the deal, we find there was sufficient evidence to support his conspiracy conviction.

IV.

Cabrera-Rivas next contends that the district court should have ordered a new trial because the government violated his due process rights by destroying his taped interview with Officer Vargas. We review the district court's refusal to grant a new trial for abuse of discretion, but because it's an abuse of discretion to commit a legal error, "we apply de novo review to [the district court's] legal determinations and clear error review to its factual findings." *United States v. Wolf*, 860 F.3d 175, 189 (4th Cir. 2017).

In support of his due process argument, Cabrera-Rivas directs our attention to *Arizona v. Youngblood*, 488 U.S. 51 (1988). As that case recounted, the state deprives defendants of due process when it "fails to disclose . . . material exculpatory evidence." 488 U.S. at 57 (discussing *Brady v. Maryland*, 373 U.S. 83 (1963)). But "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially* useful evidence does not constitute a denial of due process of law." *Id.* at 58 (emphasis added).

24

Cabrera-Rivas focuses on the government's failure to preserve a recording of his interview with Vargas. Because he admits he doesn't know whether that recording would be exculpatory, *Youngblood* applies.

*Youngblood* requires evidence of bad faith, and Cabrera-Rivas offered none at trial. True, Vargas admitted that audio recordings from witness interviews are "typically" preserved. J.A. 354. And Vargas knew it was important to preserve them. *Id.* But that shows negligence, at worst. That ends Cabrera-Rivas's *Youngblood* challenge.

Cabrera-Rivas next focuses on the timeliness of the government's disclosure. The government didn't tell defense counsel until the middle of trial that a tape of the Vargas interview existed but was destroyed.

In Cabrera-Rivas's view, this late disclosure warrants a new trial: Timely disclosure would have allowed Cabrera-Rivas to "subpoena[] those responsible for destroying the evidence," "investigate[] the misconduct before trial," and then "use[] that evidence to impeach the government's witnesses" or attack their credibility. Appellant's Br. at 43–44.

In support, Cabrera-Rivas cites our decision in *United States v. Smith Grading & Paving, Inc.*, where we said that "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." 760 F.2d 527, 532 (4th Cir. 1985). But in *Smith Grading*, as here, allegedly exculpatory evidence came out mid-trial on cross-examination. That mid-trial disclosure didn't come too late: "The information was available for use in the defendant's cross-examination of all further government witnesses as well as in the defendants' case in chief." *Id.* We held that the information was handed over soon enough to prevent any deprivation of due process. *Id.*

25

The Vargas tape wasn't *Brady* evidence. But even if it were, Cabrera-Rivas still learned of its destruction in time to exploit that fact during the trial. Vargas explained that the tape was erased on direct examination, defense counsel cross-examined him on the issue, and counsel stressed that fact in his closing argument.

The district court didn't abuse its discretion by denying a new trial.

V.

Finally, Cabrera-Rivas argues that the district court should have instructed the jury on several affirmative defenses. A defendant is entitled to such an instruction if "there exists evidence sufficient for a reasonable jury to find in his favor" on the defense. *United States v. Ricks*, 573 F.3d 198, 200 (4th Cir. 2009) (quotation omitted). We review the district court's refusal to give an affirmative defense instruction de novo. *Id.*

Cabrera-Rivas argues for four defenses: public authority, innocent intent, outrageous conduct, and entrapment by estoppel. Each argument fails.

A.

First, the public authority defense, which "allows a defendant to seek exoneration based upon his objectively reasonable reliance on the authority of a government official." *United States v. Fulcher*, 250 F.3d 244, 253 (4th Cir. 2001) (emphasis removed).

Cabrera-Rivas claims that Hector told him that Cabrera-Rivas could and should conduct a drug deal to help federal agents. But he concedes that Hector lacked actual authority to engage Cabrera-Rivas in a sting. Agent Rios had authority, but he never

26

granted it to Hector or Cabrera-Rivas. The public authority defense requires authorization from an officer with actual authority. *Id.* This missing element dooms Cabrera-Rivas.

Cabrera-Rivas, undeterred, says that Rios's "presence" convinced him that "'Hector's' exercise of apparent authority had been ratified by Special Agent Rios'[s] actual authority." Appellant's Br. at 57. But the elements of the public authority defense don't leave any room for that kind of argument.

Cabrera-Rivas admits as much when he contends that he "only committed a mistake of fact—a cognizable defense negating intent when the mens rea requirement for a crime is at least knowledge." *Id.* at 58. That concession is fatal. Public authority is an affirmative defense; mens rea is an element of the government's case in chief. The two are not the same. *Fulcher*, 250 F.3d at 252–53.

## B.

Second, innocent intent. As we explained in *United States v. Galecki*, "innocent intent" is just another way of saying that there's no mens rea. 932 F.3d 176, 189 (4th Cir. 2019). Only the Eleventh Circuit allows defendants to frame their innocent intent as an affirmative defense. *Id.* at 189–90; *United States v. Alvarado*, 808 F.3d 474, 486–87 (11th Cir. 2015).

In *Galecki*, we cast doubt on our sister circuit's path, but we didn't decide "whether to permit an innocent intent defense in this Circuit." *Id.* Cabrera-Rivas seizes on that statement, asks us to "re-examine" our reasoning in *Galecki*, and urges us to join the Eleventh Circuit. Appellant's Br. at 59.

27

But he offers no reason for us to do so.  In fact, Cabrera-Rivas's passing shot at this issue isn't enough to present it for our review.  *See United States v. Miller*, 41 F.4th 302, 313 (4th Cir. 2022); *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 n.5 (4th Cir. 2017).  We consider Cabrera-Rivas's innocent-intent argument underdeveloped and thus unpreserved.

C.

Third, outrageous conduct.  Cabrera-Rivas never asked the district court to instruct the jury on that defense, so we ask only whether it was plain error for the district court not to do so on its own.  Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732 (1993).  It wasn't.

We've recognized that, "in theory," the constitutional guarantee of due process can be violated if "law enforcement conduct . . . [is] so outrageous as to violate fundamental notions of fairness."  *United States v. Hasan*, 718 F.3d 338, 342–43 (4th Cir. 2013).  But when we say that we require outrageous conduct, we mean it.

Our decisions consistently "demonstrate a high shock threshold in the presence of extremely unsavory government conduct."  *United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991).  The government's conduct "must be 'shocking,' or 'offensive to traditional notions of fundamental fairness.'"  *Hasan*, 718 F.3d at 343 (citation omitted).

To support his argument, Cabrera-Rivas reminds us that he doesn't speak English, that he has a "cognitive impairment," and that Hector (in Cabrera-Rivas's view) persuaded him to cooperate with the government and then betrayed him.

28

The first two facts have nothing to do with the government's conduct. And the third fact, Hector's supposed double-switch, has no evidence to support it other than Cabrera-Rivas's self-interested testimony—testimony that the jury disbelieved in any event.

We need not decide whether Hector's double-switch would violate any constitutional guarantee if it happened. A "highly circumscribed" defense that is available to defendants only "in theory," *Hasan*, 718 F.3d at 343, can't be "'clear' or 'obvious'" given the "settled law of the Supreme Court or this circuit," as the plain-error standard requires, *United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013) (quotation omitted).

## D.

Finally, entrapment by estoppel. Cabrera-Rivas's counsel expressly disclaimed any reliance on that defense at trial. That waiver bars our review.

At the charge conference, the district court reminded Cabrera-Rivas that it had "disallowed the public authority affirmative defense[] and the innocent intent defense." J.A. 368–69. Cabrera-Rivas's counsel accepted that ruling but asserted that "the entrapment defense [was] still on the table." J.A. 369.

In response, the government asked for a "point of clarification." J.A. 370. The government "wasn't sure" whether the district court would instruct the jury on "entrapment by estoppel." J.A. 370. The government thought that the facts of Cabrera-Rivas's case supported an instruction on only "classic entrapment"—inducement of one without any criminal disposition to perform an act "that all parties know at all times is illegal." J.A. 371. Entrapment by estoppel, as the government explained, is "a very distinct affirmative defense," J.A. 372, that's "available when a government official tells the

29

defendant that certain activity is legal, the defendant commits the activity in reasonable reliance on that advice, and prosecution for the conduct would be unfair." *United States v. Clark*, 986 F.2d 65, 69 (4th Cir. 1993).

Because the government didn't think there was any evidence that Cabrera-Rivas thought "that selling this methamphetamine was legal," it asked for some assurance that the district court wouldn't instruct on entrapment by estoppel. Cabrera-Rivas's counsel said that he "would agree that it certainly will be classic entrapment." And the district court agreed to "instruct on that" defense. J.A. 371–72.

Cabrera-Rivas identified the entrapment-by-estoppel issue and declined to press it. That is waiver, not just forfeiture. *United States v. Council*, 77 F.4th 240, 256 (4th Cir. 2023). And waived claims can't be reviewed on appeal—de novo, for plain error, or in any other way. *Id.*

\*      \*      \*

Cabrera-Rivas makes many arguments to vacate his conviction. We disagree with them all. The district court's judgment stands.

*AFFIRMED*

30

WYNN, Circuit Judge, concurring in part, dissenting in part, and dissenting from the judgment:

I join in the opinion except for Part II, where the majority overlooks well-established precedent from the Supreme Court and this Court to deny Cabrera-Rivas the remedy that the Constitution compels—review of his competency by an Article III judge. I must dissent.

"The rule that a criminal defendant who is incompetent should not be required to stand trial has deep roots in our common-law heritage." *Medina v. California*, 505 U.S. 437, 446 (1992). "Thus, Blackstone wrote that one who became 'mad' after the commission of an offense should not be arraigned for it 'because he is not able to plead to it with that advice and caution that he ought.' Similarly, if he became 'mad' after pleading, he should not be tried, 'for how can he make his defense?'" *Drope v. Missouri*, 420 U.S. 162, 171 (1975) (quoting 4 W. Blackstone, *Commentaries on the Laws of England* \*24 (1769)). For that reason, the Supreme Court has observed "that the prohibition [against subjecting incompetent defendants to trial] is fundamental to an adversary system of justice." *Id.* at 172.

The majority sidelines this protection. It overlooks the distinctions in this Court's jurisprudence between procedural and substantive competency claims, and as a result it does not account for the different presumptions contained therein.

This Court bifurcates competency claims into two distinct categories: substantive claims, where "the movant asserts that he was, in fact, tried and convicted while mentally incompetent," and procedural claims, where "the movant contends that the trial court failed to properly ensure that the accused was competent to stand trial." *United States v. Basham*,

789 F.3d 358, 379 (4th Cir. 2015). Cabrera-Rivas raises both types of claims. He also asserts a third theory: the magistrate judge lacked the statutory authority to enter a final order determining that he was competent to stand trial.

The majority opinion first errs by assuming that, despite sixty years of clear statements from this Court and the Supreme Court, forfeiture applies to a claim about competency on direct appeal, so it need not decide whether a magistrate judge is permitted to issue a final order determining competency. Having resisted the inescapable conclusion that a magistrate judge may not do so, the majority rebuffs the procedural competency claim by declining to ascribe error to the district court for relying on this invalid order and four makeweight observations to conclude that there was an absence of "bona fide doubt" about Cabrera-Rivas's competency to stand trial. Finally, addressing the substantive competency claim, the majority discredits all of the evidence relating to Cabrera-Rivas's incompetency and does not hesitate to, in the first instance, decide that he was competent to stand trial despite the fact that there has been no valid determination on competency in this case.

## I.

I begin with Cabrera-Rivas's challenge to the magistrate judge's authority to make a final competency determination. The majority opinion concludes that this argument is irrelevant because Cabrera-Rivas either waived or forfeited it by failing to object within fourteen days of the competency order.

But as the Supreme Court observed more than a half century ago, "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive'

32

his right to have the court determine his capacity to stand trial."[1] *Pate v. Robinson*, 383 U.S. 375, 384 (1966); *see id.* at 388 (Harlan, J., dissenting) ("I agree also that [a defendant's incompetency at trial] is not 'waived' by failure to raise it and that it may entitle the defendant to a new trial without further proof. Waiver is not an apposite concept where we premise a defendant so deranged that he cannot oversee his lawyers."); *Smith v. Moore*, 137 F.3d 808, 818 (4th Cir. 1998) ("The Supreme Court has held that an incompetent defendant cannot knowingly or intelligently waive his right to have the court determine his competency.").

So long as Cabrera-Rivas can assert reasonable cause that he was not competent at the time of trial, he is entitled to a valid competency determination.[2] Such a rule makes sense: competency is the *sine qua non* of a fair trial as upon it is predicated "the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Riggins v.*

---

[1] The *Pate* Court used the language of waiver, but in that case the state argued that the defendant "intelligently waived this issue by his failure to request a hearing on his competence at the trial." 383 U.S. at 378. Under our current doctrine, such argument would be properly seen as sounding in forfeiture, not waiver. *See Stokes v. Stirling*, 64 F.4th 131, 136 n.3 (4th Cir. 2023).

[2] To be clear, this Court has held that arguments surrounding competency are subject to procedural default in habeas proceedings. *See Smith*, 137 F.3d at 818–19 ("The rather unremarkable premise behind *Drope* and *Pate* is that an incompetent defendant cannot knowingly or intelligently waive his rights[, but] . . . the rationale of *Drope* and *Pate* are inapposite in the context of a procedural default."). While this Court has noted that the courts of appeal are divided on this issue, it has not found any reason to revisit its decision. *See Basham*, 789 F.3d at 379 n.10. Thus, I will not do so here either. Regardless, this case is on direct appeal, where procedural default does not apply.

33

*Nevada*, 504 U.S. 127, 139–40 (1992) (Kennedy, J., concurring in the judgment). Much like effective assistance of counsel, competency is so vital that we consider it unwaivable.

Before trial, the district court referred a motion to determine Cabrera-Rivas's competency to a magistrate judge under 28 U.S.C. § 636(b). That provision differentiates non-dispositive pretrial matters from dispositive matters. For non-dispositive pretrial matters, the magistrate judge may hear the issue and make a determination that is reviewable by the district court for clear error. For dispositive matters, by contrast, the magistrate judge writes a report and recommendation that the district court may accept, reject, or modify. Federal Rule of Criminal Procedure 59 mirrors this approach.

Competency to stand trial is a dispositive matter—no matter how much the majority resists taking a position on this issue. The Federal Magistrates Act classifies as dispositive motions that could formally end proceedings, like a motion "to dismiss or quash an indictment," as well as those that could effectively end proceedings, like a motion "to suppress evidence in a criminal case." 28 U.S.C. § 636(b)(1)(A). Competency falls in the former category because, after all, "[t]he Due Process Clause of the Fifth Amendment prohibits the federal government from trying and convicting a mentally incompetent defendant." *Basham*, 789 F.3d at 379; *see also Godinez v. Moran*, 509 U.S. 389, 396 (1993) ("A criminal defendant may not be tried unless he is competent[.]"). So when the Ninth Circuit analyzed the statute governing competency hearings, it held that the decision to authorize involuntary medication designed to restore competency is a dispositive pretrial matter that cannot be fully delegated to a magistrate judge because it "will have direct

34

consequences on [the defendant]'s defense that he is not competent to stand trial." *United States v. Rivera-Guerrero*, 377 F.3d 1064, 1069 (9th Cir. 2004).

The constitutional responsibilities of a federal court during trial further support the position that Congress would only permit delegation of a competency determination if the findings were susceptible to de novo review. The Supreme Court has held that "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial" even if doing so may "abort[] the trial." *Drope*, 420 U.S. at 181–82. And recognizing that a defendant's competency is not static and thus can change over the course of proceedings, Congress emphasized that competency motions can be made "[a]t any time after the commencement of a prosecution" and declined to impose a limit on the number of times such motions can be made. 18 U.S.C. § 4241(a).  It would thus be passing strange for Congress to permit the district court to fully delegate initial fact-finding on competency and only be able to review that fact-finding for clear error.

If there can be any possible remaining doubt, the canon of constitutional avoidance is sufficient to remove it. Where, as here, "[a]llowing a magistrate judge to make the ultimate decision in a matter of such clear constitutional import would raise serious Article III concerns," we should interpret the relevant rules and statutes to prevent the delegation to the magistrate judge of final competency determinations. *Rivera-Guerrero*, 377 F.3d at 1070.

Thus, it is clear that the magistrate judge erred by purporting to submit a final order on competency, rather than a report and recommendation. This error was compounded as

35

there appears to be no record of the district court adopting the final order as if it were a report and recommendation. And why would it have? The Western District of North Carolina's local rules assert—incorrectly, for the reasons I've explained—that "[h]earing motions and entering orders for examinations to determine mental competency" are non-dispositive pretrial matters that a magistrate judge may perform. W.D.N.C. Crim. R. 59.1(a)(8). Consequently, the competency finding here never received de novo review from an Article III judge. This is not what Congress, or the Constitution, permits.

But the majority declines to engage with the merits of Cabrera-Rivas's argument. It insists that Cabrera-Rivas has forfeited this argument "twice over." Maj. Op. at 13.

The majority first errs by asserting that Cabrera-Rivas forfeited his challenge by not raising it in his opening brief. In his opening brief, however, Cabrera-Rivas argued that the district court abused its discretion when it artificially restricted the evidence it would consider by limiting "its judgment to personal observations made at trial." Opening Br. at 30. Indeed, as recounted below, the lower court erroneously relied upon the magistrate judge's order to forgo review of any of the evidence presented to the magistrate judge. Consequently, Cabrera-Rivas sought review of *all* the evidence on competency "from arraignment through sentencing." *Id.* And the argument that the district court abused its discretion by not considering all of the evidence related to competency "from arraignment through sentencing" is sufficient to preserve the argument that the district court abused its discretion by not considering the evidence related to competency collected between arraignment and trial—namely, the evidence before the magistrate judge.

36

Second, the majority flies past the instruction of the Supreme Court by arguing that Cabrera-Rivas forfeited competency at the district court. In doing so, the majority attempts to analytically distinguish forfeiture of the right to a competency hearing from forfeiture of the right to a proper competency determination. The majority concedes that Cabrera-Rivas did not forfeit his right to a competency hearing: "He asked for such a hearing, and the magistrate judge gave him one." Maj. Op. at 14. But what good was this hearing? It did not result in a valid order. And the district court ignored any evidence that was produced at the hearing.

Defendants generally do not request hearings just because they have decided that a federal courthouse represents a welcome change of scenery. Rather, they request hearings as a means to have their rights properly adjudicated. But the majority rejects this reasoning and concludes that while Cabrera-Rivas did not forfeit his right to a hearing, he did forfeit his right to have his competency determined by an Article III judge. Here again, the majority runs headlong into the same problem: how does a defendant who is incompetent to stand trial forfeit his right to Article III adjudication of his competency? The majority provides no answer.

Instead of providing an answer, the majority opinion claims that this reasoning "proves too much" as under my rule, "no argument could be forfeited once competency came into question." Maj. Op. 14 n.4. The majority opinion just stumbled into one of the reasons that our legal system prevents incompetent individuals from being tried: they are incapable of protecting their own rights. That is why competency is the *sine qua non* upon which a fair trial is predicated. Of course an incompetent individual cannot forfeit an

37

argument. So if competency does come into question, the court must hold a competency hearing and render a valid determination as to whether the defendant is competent. Only then can forfeiture and waiver be assessed.[3]

Moreover, even if the majority's position on forfeiture at the district court were defensible, Cabrera-Rivas is still entitled to de novo review. After trial, Cabrera-Rivas moved for a retrospective competency hearing. Under 18 U.S.C. § 4241(a), a district court must conduct a competency hearing "if there is reasonable cause to believe that the defendant may presently be" incompetent. Yet in a cursory order, the district court denied this motion in part because "a magistrate judge conducted a full evidentiary hearing prior to trial and found that the defendant did not carry his burden to prove by a preponderance of the evidence that he was not competent." J.A. 630.[4] From that statement, it is apparent that the district court never conducted a de novo review of the evidence gathered before trial about Cabrera-Rivas's competency. That Cabrera-Rivas did not object to the magistrate judge's finding is immaterial to this analysis: the failure to object to an order made outside the scope of the decision-maker's authority does not transmogrify it into a

---

[3] The majority opinion notes that I joined Part V.D of the opinion where this Court determines that Cabrera-Rivas waived entrapment by estoppel. But joining this portion of the opinion is not inconsistent with the general rule stated above. After all, if the district court were to hold a retrospective competency hearing and determine that Cabrera-Rivas had been competent to stand trial, his waiver would have been valid. It would make little sense to refrain from answering this question and only address it when it is raised again in a subsequent appeal. And if a retrospective competency hearing were to determine that Cabrera-Rivas had not been competent to stand trial, our ruling on waiver would be immaterial as Cabrera-Rivas would have to be tried again after his competency has been restored. In this way, a defendant's competency still dictates whether forfeiture can apply.

[4] Citations to the "J.A." and "S.J.A." refer, respectively, to the Joint Appendix and Sealed Joint Appendix filed by the parties in this appeal.

valid order. Thus, the district court erroneously relied on the magistrate judge's *ultra vires* order to deny Cabrera-Rivas a statutory protection that Congress designed to preserve fundamental constitutional principles.

Nevertheless, the majority insists that any resulting challenge to the magistrate judge's authority on appeal must satisfy plain-error review, under which "a defendant [must] establish (1) an error; (2) that is plain; and (3) that affects his substantial rights." *United States v. Collins*, 982 F.3d 236, 241 (4th Cir. 2020). No matter.

Here, a magistrate judge entered a final order on a dispositive matter. That was "error." The text of the Federal Magistrates Act and Rule 59 clearly delineate the line between dispositive and nondispositive matters. And settled law from the Supreme Court that incompetency constitutes an absolute bar to prosecution only reinforces the conclusion that this error was clear and obvious. Thus, the error was "plain."

So the majority decides to rest its analysis on the "substantial rights" prong. To satisfy this prong, there must be "'a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)). The majority asserts, without analysis, that "[h]ad the magistrate judge proceeded by report and recommendation instead of by order, the result would be just the same—Cabrera-Rivas would fail to object, and the district court wouldn't review the report." Maj. Op. at 16.

I disagree. Had the magistrate judge properly labeled his findings as a "report and recommendation," instead of as an "order," Cabrera-Rivas's counsel would have been put

on notice that the factual findings were subject to de novo instead of clear-error review. Standards of review matter; they shape litigants' behavior. Challenges that would be frivolous under clear-error review become possible or plausible under de novo review. Had the magistrate judge's findings been properly labelled, Cabrera-Rivas's able counsel may very well have objected. And as I make clear below, de novo review of the totality of the evidence presented to the magistrate judge could reasonably lead to the conclusion that Cabrera-Rivas was incompetent. The probability that this would happen is "sufficient to undermine confidence in the outcome." *United States v. Garrett*, 128 F.4th 583, 599 (4th Cir. 2025) (quoting *Dominguez Benitez*, 542 U.S. at 83).

The majority opinion contends that I am engaging in "sheer speculation" as, after all, the time in which to object to the magistrate judge's order was short and fell during final trial preparations. Maj. Op. at 16 n.6. But the majority opinion just identifies another consequence of the district court's error: by treating competency as a pretrial matter under 28 U.S.C. § 636(b)(1)(A), defendants are left with the impression that competency must be adjudicated before trial. *See also* W.D.N.C. Crim. R. 59.1(a)(8). This mistake further deters defense counsel from asserting their client's rights. And regardless, a defendant's failure to object to an invalid order does nothing to preclude the trial court from reviewing evidence analyzed in that order.

Perhaps experiencing some unease with relying solely on the "substantial rights" prong, the majority opinion opines that the error here may not rise to the level such that this Court should apply its discretion to correct it. Indeed, the majority asserts that "[t]he magistrate judge's decision here served justice." Maj. Op. at 15 n.5. However, when an

40

Article IV territorial court judge heard oral argument as part of a panel of an overworked federal court of appeals, the Supreme Court vacated and remanded the judgments rendered by this improperly constituted panel even though neither party had objected. *Nguyen v. United States*, 539 U.S. 69, 83 (2003). The Court determined that it was unnecessary to assess "whether the fairness, integrity, or public reputation of the proceedings were impaired" because "to ignore the violation of the designation statute in these cases would incorrectly suggest that some action (or inaction) on petitioners' part could create authority Congress has quite carefully withheld." *Id.* at 80. When an improper decision maker rendered a decision, the Supreme Court did not even need to consider the public-reputation prong. The same principle applies to this case.

But, the majority opinion contests, magistrate judges are different than the aforementioned Article IV territorial court judge because "parties can empower them by consent." Maj. Op. at 16 n.5 (quoting *Peretz v. United States*, 501 U.S. 923, 932 (1990)). As will quickly become clear, that is not true in this case. The decision the majority opinion relies on for its proposition determined that a magistrate judge may conduct *voir dire* for a felony criminal trial when the defendant expressly consents. *Peretz*, 501 U.S. at 932, 940. But the Supreme Court came to that conclusion only because "with the parties' consent, a district judge may delegate to a magistrate [judge] supervision of entire civil and misdemeanor trials" and "[t]hese duties are comparable in responsibility and importance to presiding over *voir dire* at a felony trial." *Id.* at 933. However no one suggests that a defendant could consent to a magistrate judge presiding over a felony trial. So it is not apparent why the majority opinion posits that a defendant could consent to empower a

magistrate judge to resolve a dispositive issue in a felony case. And the majority opinion provides no authority for this conclusion.

The appeal should end here. The district court failed to perform its duty to assure itself that Cabrera-Rivas was competent to stand trial. The only determination on his competency was *ultra vires* and thus void. The majority, however, only compounds the problems from here by not analytically distinguishing our jurisprudence for procedural competency claims from that for substantive competency claims.

## II.

The majority opinion fails to recognize the relevant presumption and burden shifting that pertains to a procedural competency claim when it reviews Cabrera-Rivas's challenge to the district court's refusal to order a retrospective competency hearing. For procedural competency claims, the defendant "is presumed to have been incompetent during the trial proceedings, and the government bears the burden of showing competency." *Basham*, 789 F.3d at 379 n.9. By this, this Court means that when determining whether to hold a competency hearing, "[t]he trial court must 'look at the record as a whole and accept as true all evidence of possible incompetence' in determining whether to order a competency hearing." *United States v. Mason*, 52 F.3d 1286, 1290 (4th Cir. 1995) (quoting *Smith v. Ylst*, 826 F.2d 872, 877 (9th Cir. 1987)). The district court must order a competency hearing if there is "reasonable cause" to believe that the defendant may be incompetent. 18 U.S.C. § 4241(a). A petitioner prevails on appeal if they can show "that the trial court ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." *Beck v. Angelone*, 261 F.3d 377, 387 (4th Cir. 2001) (quoting *Pate*, 383 U.S. at 385). Thus, a

42

defendant "need not demonstrate on appeal that he was in fact incompetent, but merely that the district court should have ordered a hearing to determine the ultimate fact of competency." *United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007).

Because the majority elides discussion of the evidence bearing on Cabrera-Rivas's competency, I first review that evidence to ascertain whether the district court abused its discretion by denying the existence of a "reasonable cause" to believe that Cabrera-Rivas was incompetent to stand trial. I view there to be more than enough evidence to show reasonable cause.

I begin with the testimony proffered before the magistrate judge.[5] William Terpening, Cabrera-Rivas's counsel, stated that in his twenty years of legal practice, "not in any other criminal case that I've ever had has that [behavior] arisen to the point where you can't convey ideas to the client." J.A. 184. He further stated that "it is impossible to have any confidence that he understands explanation of discovery, the facts, legal terminology at any level beyond just kind of parroting back what the terms mean." J.A. 183.

Tomi Suzuki, an associate at Terpening's firm, testified that Cabrera-Rivas was "pretty erratic" and was "very quick to get upset or angry." J.A. 63. At times, he made her feel physically uncomfortable, and he would become confrontational with the interpreters. Even while attempting to discuss legal strategy through an interpreter, "he would get very

---

[5] Even though the magistrate judge's order itself was *ultra vires*, the testimony proffered before him was sworn and subject to cross examination, so it is appropriate for our review.

upset, and he would go on [a] long tangent where it was difficult to understand what he was saying or really understand kind of points that he was trying to make." *Id.* She testified that she did not believe Cabrera-Rivas understood legal concepts. Lastly, she recounted Cabrera-Rivas's belief that "God's going to intervene or otherwise God's going to come down and I guess save him essentially from anything that's happening." J.A. 66.

McKensey Brock, a paralegal at the same firm, also testified that Cabrera-Rivas was "erratic and angry," and that his legal team once "had to leave the meeting early because he was so agitated and we couldn't get him to calm down." J.A. 73. She reported that he appeared receptive to instructions of law in the case "[z]ero percent" of the time. J.A. 74.

Cabrera-Rivas's wife submitted an affidavit detailing his propensity to fly into rages, "explode uncontrollably," and "get violent and hit things." J.A. 49. The affidavit concludes that "I do not believe that Cristian processes day-to-day and social interactions in a normal or healthy way." *Id.*

For its part, the Government relied on the testimony of Dr. Ashley Jenkins, a forensic psychologist. Dr. Jenkins administered two objective psychological assessments. The first test, the Comprehensive Test of Nonverbal Intelligence, Second Edition (CTONI-2), is designed to measure cognitive functioning. Across three measures of cognitive functioning, Cabrera-Rivas's scores were at or below the first percentile of scores for same-aged peers. Dr. Jenkins attributed these scores to the fact that he had only received three years of schooling in Honduras. The second test, the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2), is designed to measure personality functioning. On this test, Cabrera-Rivas scored highly, which means his score correlates to "present[ing] more

44

extreme psychological problems than most psychiatric inpatients." S.J.A. 706. Yet, rather than concluding Cabrera-Rivas has extreme psychological problems, Dr. Jenkins considered this test invalid and found that he had "extreme item endorsement," the tendency to answer "true" to multiple questions, thus leading to inaccurate scores. J.A. 95. While this is typically suggestive of possible malingering, there was no other evidence of malingering during the evaluation.

Despite the fact that Cabrera-Rivas failed one objective test and performed so poorly on the other that Dr. Jenkins rendered it invalid, Dr. Jenkins declined to give a formal competency test, reasoning that Cabrera-Rivas was "able to communicate well." J.A. 132. Dr. Jenkins admitted that Cabrera-Rivas required instruction—what she termed "education"—for him to be able to explain what certain legal terms mean. By this, she explained what a term, such as "jury," meant and then had him repeat it to her in his own words to see if he retained the definitions. Such repetition might occur within minutes, an hour, or the next time she saw him. This, apparently, was all that was required for her conclusion that Cabrera-Rivas "communicate[d] well."[6]

Likewise, Dr. Jenkins was unconcerned that Cabrera-Rivas remembered fewer than half of the criminal events reflected in his record. When asked about this during the hearing, Dr. Jenkins testified that it was not unusual for patients undergoing evaluation "to maybe

---

[6] Evidently, Dr. Jenkins did not assess whether this ability to "communicate well" extended to the written word. At trial, there is an exchange bordering on farcical where the district court permits Cabrera-Rivas to authenticate transcripts of phone calls over counsel's objection that he might not be literate. J.A. 394–95.

minimize some of the negative parts of themselves." J.A. 123. Thus, Cabrera-Rivas's lack of recollection did not reflect "an ongoing memory concern." *Id.*

In her competency report, Dr. Jenkins admitted that Cabrera-Rivas has an academic or educational problem. She found that "[i]t is unclear if his intellectual deficits are due to him not receiving formal schooling throughout his childhood or if there is an organic or neurodevelopmental etiology." S.J.A. 709. But, ignoring the objective tests she performed, she determined that he must have "a certain level of functioning" because "[h]e is a married man with three children, he immigrated from Honduras alone, he has reportedly worked in construction and selling used cars and he is involved with a current drug trafficking case." *Id.* The ability to marry and procreate does not signal competency within the Sixth Amendment. And actions that Cabrera-Rivas had taken years before do not establish his competency at the time of the trial. Nor does unproven conduct alleged in an indictment. A grand jury may be willing to "indict a ham sandwich," but that does not render the ham sandwich competent to stand trial. *United States v. Navarro-Vargas*, 408 F.3d 1184, 1195 (9th Cir. 2005) (en banc) (cleaned up).

Following trial, in its order denying a motion for a retrospective competency hearing, the district court did not review any of this evidence. Instead, it merely noted that "a magistrate judge conducted a full evidentiary hearing prior to trial and found" Cabrera-Rivas to be competent. J.A. 630. The district court further made four observations of Cabrera-Rivas's conduct at trial that it claimed established his competency: (1) that defense counsel did not complain during jury selection that Cabrera-Rivas was not being helpful; (2) that Cabrera-Rivas alerted during trial when the sound equipment relaying English-to-

Spanish interpretation was not working; (3) that "the defendant answered appropriately" when questioned by the court about whether he wanted to testify; and (4) that "the defendant expressed cogently details about his" personal history during his testimony. J.A. 631.

It was an abuse of discretion for the district court to determine that these four observations—coupled with the existence of an invalid order—sufficed to overcome the legal presumption that Cabrera-Rivas was incompetent, especially in light of the aforementioned evidence. Cabrera-Rivas's attorney electing not to alert the court during jury selection about his client's unhelpfulness does not create an inference that the attorney assessed Cabrera-Rivas to have been helpful, much less competent. Nor do I view the ability to recognize when the sound feeding into one's headset abruptly cuts off as demonstrating competency. The district court also credited Cabrera-Rivas's answer to the question of whether he wanted to testify, but that rambling and rather incoherent answer does not lend much comfort: Cabrera-Rivas, through an interpreter, said "Yes, I would like to testify. And I also wanted Marco here, the three people that were arrested, so that I could speak in my language, swear on the Bible because I will tell the truth that, you know, I didn't have anything to do with that." J.A. 368. If anything, this supports Suzuki's testimony that Cabrera-Rivas would respond to questions with a "long tangent where it was difficult to understand what he was saying or really understand kind of [the] points that he was trying to make." J.A. 63.

Finally, the district court cites Cabrera-Rivas's testimony at trial. Yet even a cursory review of the trial testimony sows doubt about the district court's assessment that he gave

47

it "cogently." J.A. 631. To illustrate, it might be helpful to review portions of the first few minutes from Cabrera-Rivas's testimony. Defense counsel began the examination by asking whether Cabrera-Rivas had ever used other names. Cabrera-Rivas responded:

> I didn't use it. Immigration gave me that name. I came in with three goods [sic] gunshot wounds in the stomach.
>
> When I came through Immigration my life had been very bad, very poor. So I came, I rode the beast, the train from Honduras. They call it "The Beast." I rode the beast from Honduras. And I came because my father was killed by the gang, the 18 gang in Honduras. My mom died of cancer when she was 25 years old.

J.A. 376. Minutes later, Cabrera-Rivas was asked whether he considered himself to be intelligent. He responded: "I do not believe I am intelligent because if I were intelligent I would not drink." J.A. 378. Defense counsel's efforts to establish how Cabrera-Rivas first met the undercover agent did not fare much better. The transcript reads:

> Q: Did Hector approach you?
>
> A: Hector saw me drunk. And so I was – the boss gave me money and I was kind of directing eight workers there at the pool. And so the boss would give me money to pay those workers.
>
> Q: Okay. Did Hector appear to be intoxicated when you met him at the restaurant for the first time?
>
> A: Hector was standing up in the restaurant and it's got like a bar. And so as the attorney said, you know, since I never really had anything in Honduras, I guess I kind of liked to show off when I was here. I would buy my chains and a watch. I didn't have credit cards so I would have like, you know, a wad of cash.

J.A. 380–81. Who these workers and the boss are—or whether they existed at all—is not clear as they are never mentioned again. And the testimony failed to respond in any way that advanced the entrapment defense. Some portions of the transcript are more coherent

48

than others. Nevertheless, it strains credulity to believe that anyone walked away from trial believing that this testimony was expressed "cogently."

So what do we have? A presumption that Cabrera-Rivas was incompetent; testimony from three members of the defense team indicating that he was unable to assist in his own defense; an affidavit from his wife stating that he does not process interactions in a normal way; his failure of an objective test on nonverbal intelligence; and his performance on a personality-function test that was so deficient that Dr. Jenkins deemed it invalid. Against this, we have a psychologist's opinion that he "communicate[d] well" because he could parrot back definitions of legal terms, and demonstrated intellectual capacity by being married with children, immigrating, and being prosecuted for drug trafficking. We also have the district court's observation of a non-statement by his attorney, testimony that borders on incoherent, and Cabrera-Rivas's ability to recognize a change in the sound coming out of his headphones. And we have the contents of the magistrate judge's *ultra vires* order.

Given all of this, I would hold that the district court abused its discretion by not finding "reasonable cause" that Cabrera-Rivas lacked competency and thus not holding a retrospective competency hearing.

The majority opinion questions how district courts are supposed to know that they cannot rely on invalid orders from magistrate judges to settle questions of competency. After all, reasons the majority, the defendant never objected. Well, to start, district courts could look towards centuries of common law, Federal Rule of Criminal Procedure 59, or the Federal Magistrates Act. They could also employ a helpful shorthand: whenever a big

decision has to be made in a felony trial, it probably has to be made by either an Article III judge or the jury. None of this requires "clairvoyance." Maj. Op. at 19.

No Article III judge gave de novo review to the bulk of the evidence discussed above. So I would ask the district court to render the first valid competency determination in this case.

The majority is right to point out that there is considerable common ground in our views. We agree that when a defendant asks for a second competency hearing based on new evidence, it's the new evidence that must call competency into question. *See* Maj. Op. at 18. After all, had the old evidence been sufficient to give rise to "reasonable cause," the district court would have already ordered a competency hearing. Thus, it must be the new evidence, or the new evidence in combination with the old evidence, that tips the scales and creates "reasonable cause." But regardless, in this case, there is not "new" and "old" evidence—only evidence that never received de novo review by the district court.

So in a case where a court is faced with new evidence that, alone, *almost* raises a bona fide doubt about competency—and, when viewed in the aggregate with earlier evidence, *does* raise a bona fide doubt—it should hold a competency hearing even if it had found that the earlier evidence was not independently sufficient to create such doubt. In that situation, it is the new evidence that created the doubt. *Mason*, 52 F.3d at 1290; *see Jermyn v. Horn*, 266 F.3d 257, 292 (3d Cir. 2001) ("In determining whether there were sufficient indicia of incompetence to warrant the trial court to order a competency evaluation or hearing on its own motion, we must consider the nature and quality of the facts known to the court, and we must consider their probative force in the aggregate,

50

although any one factor may be sufficient depending on the circumstances." (citing *Drope*, 420 U.S. at 180)). But it cannot be true that once a trial court considers evidence that almost, but does not quite, creates a bona fide doubt, the evidence vanishes and is no longer significant despite what the court may later come to learn.

Where the majority opinion and I diverge is on the application of this rule to this case. The majority opinion claims that "Cabrera-Rivas argued to the district court that his conduct during trial cast doubt on his competency, so it was only proper for the district court to respond by focusing on that conduct." Maj. Op. at 18. But this conclusion is at an irreconcilable tension with our established law which, as the majority correctly acknowledges, holds that "district courts should consider 'the record as a whole.'" Maj. Op. at 18 (quoting *Mason*, 52 F.3d at 1290).

And regardless, Cabrera-Rivas did not—as the majority opinion might have one believe—ground his argument for a retrospective competency hearing only on his conduct at trial. To be sure, the motion does discuss his conduct at trial, stating that "[a]t trial, Mr. Cabrera-Rivas was unable to comprehend the proceedings, and at the conclusion of trial, raised questions with defense counsel that, ultimately, re-raised the issue of competency." J.A. 551. And "[a]fter observing Mr. Cabrera-Rivas' behavior at trial, including during his testimony, there is even greater reasonable cause to believe that Mr. Cabrera-Rivas was unable to comprehend the proceedings against him." J.A. 552.

But the motion also discussed the evidence presented before the magistrate judge, namely the Psychiatric Report, which, Cabrera-Rivas argued, acknowledged that he "presented more extreme psychiatric problems than most psychiatric impatients [sic]." J.A.

51

551 (quoting S.J.A. 706). And he asked the district court to consider all of the evidence: "[i]n considering whether there is reasonable cause to order a competency hearing, a trial court must consider *all evidence before it*, including evidence of irrational behavior, the defendant's demeanor at trial, *and medical opinions concerning the defendant's competence*. J.A. 551–52 (emphasis added) (citing *Mason*, 52 F.3d at 1290).

In short, Cabrera-Rivas asked the district court to order a retrospective competency hearing based on all the evidence. The district court declined to consider all of the evidence. Cabrera-Rivas argued to this Court that the district court abused its discretion by not considering all of the evidence. The majority opinion agrees that all of the evidence should be considered holistically. *See* Maj. Op. at 18. Yet, somehow, the majority opinion concludes that Cabrera-Rivas forfeited the argument that all evidence must be considered. Worse still, the majority opinion declines to ascribe error to the district court's decision not to give de novo review to all of the evidence. This is not a matter where I "simply would have weighed the facts differently." Maj. Op. at 18. Instead, I would have weighed all of the facts, and I find it an abuse of discretion to not have done so.

## III.

Cabrera-Rivas also raises a substantive competency claim. Here, the presumption shifts, and Cabrera-Rivas "is presumed to have been competent during his trial." *Basham*, 789 F.3d at 379. He "bears the burden of proving, by a preponderance of the evidence, that he was incompetent." *Id.* As the foregoing discussion makes clear, Cabrera-Rivas has never received a valid judicial determination on competency. Thus, despite the substantial evidence suggesting he was incompetent at the time of trial, I am hesitant to make this

52

determination in the first instance. Therefore, I would deny this claim until there is a valid order susceptible to this Court's review.

The majority views the magistrate judge's ruling on competency—regardless of its validity—as good enough. But the Federal Magistrates Act must not be so lightly brushed aside. In it, Congress "carefully delineate[d] the types of matters that may be referred to magistrate judges, so as to ensure that 'the essential attributes of the judicial power' remain in Article III tribunals." *Equal Emp. Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 98 (3d Cir. 2017) (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 77 (1982)). A decision on competency—a dispositive issue relating to a claim or defense in a felony case—reaches the core of judicial power. That the magistrate judge apparently misapprehended the scope of his authority is no excuse for this Court to abrogate its duty to review the district court's error in assigning the competency determination to the magistrate judge in the first place.[7]

## IV.

In concluding its analysis regarding the competency issue, the majority adds the rhetorical flourish that "[i]f Cabrera-Rivas wanted review by an Article III judge, all he had to do was ask." Maj. Op. at 17. But he did ask. Twice. The first time, his request was met with an *ultra vires* order. The second time, the district court erroneously relied on that *ultra*

---

[7] None of this, of course, should be construed as a criticism of the magistrate judge in this case. After all, he only followed his court's local rule and the delegation made to him by the district court. This dissent only emphasizes that Congress has carefully delineated the scope of magistrate judges' authority and that these choices should be respected by this Court.

*vires* order to conclude that it did not need to make a competency determination. Cabrera-Rivas now asks a third time for a competency determination by an Article III judge. But the majority reasons that the *ultra vires* order, the order predicated on the *ultra vires* order, or a combination thereof was sufficient to comply with the requirements of 18 U.S.C. § 4241. I cannot agree.

It also should not go unacknowledged that this case is situated amidst a deep and entrenched circuit split involving at least eight federal courts of appeals about the preservation of arguments related to competency to stand trial. *See Yang v. United States*, 114 F.4th 899, 909–10 (7th Cir. 2024) (collecting cases), *cert. denied*, 145 S. Ct. 1182 (2025). Notably, these decisions only concern procedural default of challenges to substantive and procedural competency in habeas proceedings.

Today, the majority goes further than any of these courts by finding that competency can be forfeited on direct appeal. Indeed, according to the majority's reasoning, competency may be forfeited long before a single witness is heard or the jury empaneled. This Court should not go so far.

But even in its zealousness to make new law by extending waiver and forfeiture to matters of competency on direct appeal, the majority declines to address the question of whether a magistrate judge may properly enter a final order on competency. And it does nothing to address the Western District of North Carolina's local rule that purports to delegate to magistrate judges the authority to determine this dispositive issue. As a result, the majority's opinion will only sow confusion and invite more litigation.

54

Because Cabrera-Rivas has never had a valid determination on his competency, this case should be remanded to the district court to perform a retrospective competency determination. And if the district court should find that such a determination is not feasible at that time, Cabrera-Rivas would have to be retried at a time the district court could be assured of his competence. *See Mason*, 52 F.3d at 1293; *see also United States v. Haywood*, 155 F.3d 674, 681 (3d Cir. 1998) ("Given the inherent difficulties in retrospective competency determinations, such *nunc pro tunc* evaluations are not favored. However, such a determination may be conducted if a meaningful hearing on the issue of the competency of the defendant at the prior proceedings is still possible." (quoting *United States v. Renfroe*, 825 F.2d 763, 767 (3d Cir. 1987))). There is, however, also a possibility that the record is sufficient that a meaningful hearing could occur and Cabrera-Rivas's rights would be vindicated.

With great respect for the views of my fine colleagues, I must dissent.